2 A.3d 1117 (2010)
415 N.J. Super. 518
Shana Faith MASSACHI, as Administratrix and Administratrix Ad Prosequendum of the Estate of Sohayla Massachi, deceased and Andy Fuller, Administrator of the Estate of Pamala Joy Fuller, Individually, deceased, Plaintiffs-Respondents/Cross-Appellants,
v.
CITY OF NEWARK POLICE DEPARTMENT,[1] Defendant-Appellant/Cross-Respondent.
No. A-5252-07T1.
Superior Court of New Jersey, Appellate Division.
Argued March 8, 2010.
Decided August 4, 2010.
*1119 Cindy Nan Vogelman, Secaucus, argued the cause for appellant/cross-respondent (Chasan Leyner & Lamparello, attorneys; Ms. Vogelman, of counsel and on the briefs; Maria P. Vallejo, on the briefs).
Brian J. Levine argued the cause for respondents/cross-appellants (Brenner & Levine, P.A., attorneys; Mr. Levine, of counsel and on the briefs; Robert E. Brenner, Somerville, on the briefs).
Before Judges LISA, BAXTER and ALVAREZ.
The opinion of the court was delivered by
*1120 BAXTER, J.A.D.
This appeal requires us to decide a question left unresolved in our prior opinion in this case, Massachi v. AHL Services, Inc., 396 N.J.Super. 486, 508, 935 A.2d 769 (App.Div.2007), certif. denied, 195 N.J. 419, 949 A.2d 847 (2008). In particular, we now decide whether N.J.S.A. 52:17C-10, commonly known as the 9-1-1 immunity statute, provides immunity to employees of defendant City of Newark's (City) 9-1-1 emergency communications center for the employees' bungled response to a call for emergency police assistance. Their negligent mishandling of the call, and failure to properly dispatch police, contributed to the murder of Sohayla Massachi by her former boyfriend. After an Essex County judge denied the City's motion for summary judgment by concluding that the 9-1-1 statute did not provide immunity, the case proceeded to trial, resulting in a jury award of $5,512,000 to plaintiff, the estate of Sohayla Massachi.
We now hold that N.J.S.A. 52:17C-10 does not afford immunity to a 9-1-1 emergency communications center and to its employees for the negligent rendering of 9-1-1 services, including dispatching police to an incorrect location, failing to keep the caller on the line so she could update the 9-1-1 employee on the location of the perpetrator and failing to broadcast an alert to surrounding municipalities. We also reject the City's claim that the "increased risk/substantial factor" jury charge was improper. We do, however, agree that the judge's omission of special jury interrogatories asking the jury to apportion damages had a clear capacity to produce an unjust result. In particular, not asking the jury to determine, in percentages, what portion of the ultimate injury (Massachi's death) was the result of her pre-existing condition as an abductee, and what portion of the ultimate injury was the result of the City's negligent handling of the 9-1-1 call, created reversible error. We therefore reverse the May 22, 2008 order entering judgment in plaintiff's favor and remand for a new trial; however, as the error did not affect the quantum of damages, the retrial shall be limited to liability and proximate cause.

I.
Although the facts are set forth in considerable detail in our prior opinion, id. at 491-93, 935 A.2d 769, we now briefly recite the pertinent facts, as drawn from the trial record, to provide context for the legal issues we address today. On May 10, 2000, two high school girls saw Christopher Honrath force Massachi, who was screaming and crying for help, into his car. The girls reported the incident and the car's license plate number to an Argenbright Security (Argenbright) guard who was stationed at the guard booth at the main gate of Seton Hall University (Seton Hall). When the guard stated there was nothing he could do because the incident did not occur on University property, the girls telephoned the South Orange Police Department to report the abduction and provided the license plate number and a description of the car and its occupants.
At approximately the same time, two off-duty Essex County Sheriff's Officers, Melissa Lester and Elwood Thompson, witnessed Honrath pull Massachi into his car. Lester called 9-1-1, and the call was routed to the City's 9-1-1 emergency communications center. Lester provided a description of the incident, the car, and the car's direction of travel to 9-1-1 operator Debony Venable.
Although Venable was unsure how to handle the call, she consulted a co-worker instead of her supervisor, as was required by police department guidelines. Venable put the information into the 9-1-1 computer *1121 system, but failed to note the last known location of Honrath's car or that the car was in motion; misidentified the car as a Chevrolet Blazer instead of a Plymouth Laser; failed to record the vehicle's path of travel, which resulted in a police unit being erroneously dispatched to the original location even though Honrath was already gone; and failed to keep Lester on the line so that Lester would be able to update the responding units on the vehicle's path of travel.
Dispatcher George Mike "ran" the license plate and printed out the name and address of the vehicle's owner, Honrath. However, although Mike was required by police procedures to also issue a general alert to all Newark police units and to neighboring municipalities, he failed to do so. Mike also had the capacity to contact Westfield police, where Honrath lived, but did not do so.
A short time later, Westfield police were notified by Gary Powell, who shared a Westfield house with Honrath, that Honrath had pulled a woman into his room and that she was screaming that Honrath had a gun. Westfield police responded to the house, knocked on Honrath's door, and yelled "police." Two gunshots were then heard from inside Honrath's room. The officers did not enter the room, but instead waited thirty minutes for the arrival of an Emergency Response Team. The Response Team found Honrath dead and Massachi unconscious with a bullet wound to the head; Massachi was transported to a Newark hospital where she died two days later.
Disciplinary sanctions were imposed against Venable for her violation of police department policies and procedures in her handling of the 9-1-1 call.
To place in context the 9-1-1 immunity issue, we first describe the procedural posture of the case at the time we issued our published opinion in 2007. On August 26, 2005, prior to commencement of trial, the judge had granted summary judgment to the City, finding that it was entitled to immunity under a portion of the Tort Claims Act, N.J.S.A. 59:5-4. Plaintiff appealed. We held that the Tort Claims Act did not provide immunity to Newark under these circumstances, reversed the trial court's grant of summary judgment and remanded plaintiff's claim against Newark for trial. Massachi, supra, 396 N.J.Super. at 507-08, 935 A.2d 769. We did not rule upon Newark's argument that it was entitled to immunity under the 9-1-1 statute, N.J.S.A. 52:17C-10, as the issue had not been squarely addressed in the Law Division in light of the grant of summary judgment based upon the Tort Claims Act. Id. at 508, 935 A.2d 769. We preserved the issue for remand. Ibid.
On April 29, 2008, a few days before the trial was scheduled to commence, the City again moved for dismissal of plaintiff's complaint pursuant to the 9-1-1 immunity statute, N.J.S.A. 52:17C-10. The City argued that a plain reading of the statute afforded immunity to the City for Venable's and Mike's actions in delivering 9-1-1 services unless their actions were wanton, willful, or malicious, which plaintiff had not alleged. Plaintiff opposed the City's motion, arguing that the 9-1-1 statute provided immunity only for negligence in the mechanical delivery of services and not for Venable's and Mike's "rendering" of services. The judge denied the City's motion on procedural grounds, but did find that the City had not provided the court with any precedent, from New Jersey or elsewhere, to support its argument that the City should be afforded immunity under N.J.S.A. 52:17C-10. The case proceeded to trial, resulting in the verdict we have already described.

*1122 II.
The City argues that the Law Division's denial of its motion for judgment under the 9-1-1 immunity statute was error, because, according to the City, both N.J.S.A. 52:17C-10(d) and (e) provide immunity for the very type of negligent acts and omissions that Venable and Mike committed. In particular, the City maintains that subsection (d) provides immunity to a public safety answering point[2] (PSAP) such as Newark's 9-1-1 emergency communications center for a wide array of design or mechanical failures at a PSAP and for "`any other aspect of delivering enhanced 9-1-1 service, wireless 9-1-1 service or wireless enhanced 9-1-1 service.'" (quoting N.J.S.A. 52:17C-10(d)) (emphasis added). The City relies heavily on the immunity from liability for errors in "delivering" PSAP services. The City also relies on subsection (e), which immunizes a PSAP for errors committed while providing assistance to any law enforcement officer.
Plaintiff urges us to reject the City's subsection (d) argument, contending that the immunity conferred by that subsection is confined to a "technical failure of a 9-1-1 call service" such as the "failure of a 9-1-1 call to connect because of a service provider's faulty hardware." Plaintiff also maintains that the City's subsection (e) argument ascribes functions to a PSAP that it does not actually perform.
Because the parties' arguments rely heavily on the legislative history of the statutefrom its initial form in 1989 through the 1999 amendments that resulted in the current versionwe begin our analysis by turning first to the legislative history of N.J.S.A. 52:17C-10.

A. The 1989 statute
The 1989 statute was adopted as part of a comprehensive legislative enactment that created an Emergency Response System in the State of New Jersey. The entire package of bills was the culmination of the work of the Emergency Response System Study Commission (the Commission), which was established in January 1986, by L. 1985, c. 542, "to study and make recommendations concerning appropriate legislation to create a Statewide enhanced 9-1-1 emergency telephone system; and to study and make recommendations concerning the emergency response system in the State with a view to improving and facilitating the provisions of emergency service. . . and . . . remedying defects in the present system." After holding a series of public hearings, the Commission issued its report, Emergency Response System Study Commission, First Phase Report (Dec. 30, 1986) (Report), calling for the creation of an "enhanced" 9-1-1 system,[3] which had three components: 1) a series of technical recommendations designed to address the "overlap" and "underlap" problems in the emergency 9-1-1 telephone service that had been in place since 1967; 2) development of a proposed funding source for the new switching equipment that would be required; and 3) recommendations *1123 for a package of proposed legislation to implement the enhanced 9-1-1 system.
Notably, although none of the witnesses at any of the three public hearings the Commission conducted in Blackwood, Trenton or Paterson had recommended, or even discussed, providing telephone companies or PSAPs with immunity from liability for negligently handled 9-1-1 calls, the 1986 Report contained a section recommending immunity for any acts or omissions committed while rendering PSAP services. In a section of its Report entitled "Liability of the Telephone Companies and PSAPs," the Commission recommended:

No liability would be incurred by any telephone company or PSAP for the release of the information specified in the legislation, including non-published telephone numbers, or for the failure of any equipment or procedure in connection with the enhanced 9-1-1 service. Furthermore, no liability would be incurred by any telephone company or PSAP for any act or omission of an act committed while training for or rendering PSAP services in good faith and in accordance with the legislation.

[Id. at 21 (emphasis added).]
In furtherance of its immunity recommendation, the Commission included proposed legislation immunizing PSAPs for "any act or . . . omission of an act committed. . . in rendering PSAP services." The legislation proposed by the Commission was as follows:
No telephone company, public safety answering point, or agents of a telephone company or PSAP, shall be liable to any person who uses the enhanced 9-1-1 service established under this act for release of the information specified in this section, including non-published telephone numbers, or for failure of any equipment or procedure in connection with the enhanced 9-1-1 service or for any act or the omission of an act committed while in the training for or in rendering PSAP services in good faith and in accordance with this act.
[Id. at 31.]
The package of bills introduced in the General Assembly and Senate in response to the Commission's Report contained an immunity section that was identical to the immunity legislation the Commission recommended in its 1986 Report; however, the Sponsor's Statement made no reference to the immunity provisions. See Sponsor's Statement, Statement to A.B. No. 1576 (pre-filed for 1988). Instead, the Sponsor's Statement was confined to a description of the features of the enhanced 9-1-1 system and the ways in which the new system was superior to the system then in place. Ibid.
After introduction, A-1576 was considered by three legislative committees, the Assembly Transportation and Communications Committee, the Assembly Appropriations Committee and the Senate Committee on Revenue, Finance and Appropriations. The legislative history of the proceedings of those three committees includes no reference to the portion of the legislation establishing immunity from liability.
When Governor Thomas H. Kean signed A-1576 into law on January 18, 1989, he commented that the legislation establishing the Statewide emergency 9-1-1 telephone system would "greatly enhance the State's emergency response capabilities" by establishing a "network of `Public Safety Answering Points' with specialized computers to receive 911 calls and locate their source. The call will the[n] be routed to the appropriate emergency response agency nearest to the location of the call." *1124 Press Release, Office of the Governor, Press Release for A-135 and A-1576 (Jan. 19, 1989). The Governor's Press Release made no mention of the immunity section contained in the legislation. Ibid.
The legislation signed into law on January 18, 1989 contained an immunity provision later codified as N.J.S.A. 52:17C-10. The statute provided:
a. Whenever possible and practicable, telephone companies shall forward to jurisdictional public safety answering points via enhanced 9-1-1 network features, the telephone number and street address of any telephone used to place a 9-1-1 call. Subscriber information provided in accordance with this section shall be used only for the purpose of responding to emergency calls or for the investigation of false or intentionally misleading reports or incidents requiring emergency service.
b. No telephone company, public safety answering point, agents of, or manufacturer supplying equipment to a telephone company or PSAP, shall be liable to any person who uses the enhanced 9-1-1 service established under this act for release of the information specified in this section, including non-published telephone numbers, or for failure of any equipment or procedure in connection with the enhanced 9-1-1 service or for any act or the omission of any act committed while in the training for or in rendering PSAP services in good faith and in accordance with the act.

[N.J.S.A. 52:17C-10 (emphasis added).]
As is clear from the version of N.J.S.A. 52:17C-10 that was enacted in 1989, the statute provided three distinct types of immunity: 1) immunity for the release of non-published telephone numbers; 2) immunity for failure of any equipment or procedure used in connection with the enhanced 9-1-1 service; and 3) immunity for any act or omission in rendering PSAP services in good faith.
However, whether intentionally or unintentionally, the 1989 version of the statute conferred immunity from liability only to claims asserted by the "person who uses the enhanced 9-1-1 service." Thus, N.J.S.A. 52:17C-10, in its original form, would not have established any immunity from liability if the intended recipient of the 9-1-1 emergency service was not the person who placed the call. That is because the immunity was extended only to claims asserted by the person who actually "use[d] the enhanced 9-1-1 service established" under the statute.
Consequently, in a situation such as the one presented by this appeal, the immunity section of the statute that existed in 1989 would have provided no benefit to the City of Newark for the claims asserted by the estate of Sohayla Massachi, as it was not Massachi who made the telephone call to the City's PSAP. As we have already noted, the person "who use[d] the enhanced 9-1-1 service" was Melissa Lester, the person who witnessed Massachi's abduction.

B. The 1996 amendment
In 1996, as required by 47 U.S.C. § 332(c), the Legislature amended N.J.S.A. 52:17C-10 to provide immunity to commercial mobile communications providers similar to the immunity already afforded to telephone companies. The amendment made no revision to the language in subsection (a). The only revision to subsection (b) was the addition of the words "person providing commercial mobile radio service as defined in 47 U.S.C. § 332(d)"[4] *1125 after the words "No telephone company." As is evident, the 1996 amendment was merely a technical revision to add mobile radio service providers. Thus, the 1996 amendment made no substantive change to the immunity provisions that were already in place.

C. The 1999 amendment
The 1999 amendments revised five of the sixteen statutes that comprised the 1989 legislation. The statutory amendments added wireless telephone companies to the 9-1-1 network, N.J.S.A. 52:17C-1(p), -1(q), -1(r), -3, -4; established a permanent Enhanced 9-1-1 Commission and expanded its membership, N.J.S.A. 52:17C-2; and created the present version of N.J.S.A. 52:17C-10. The Legislature's 1999 amendments to N.J.S.A. 52:17C-10 deleted subsection (b) and added subsections (c) through (e). The 1999 version of the 9-1-1 immunity statute, which remains operative, provides:
a. Whenever possible and practicable, telephone companies shall forward to jurisdictional public safety answering points via enhanced 9-1-1 network features, the telephone number and street address of any telephone used to place a 9-1-1 call. Subscriber information provided in accordance with this section shall be used only for the purpose of responding to emergency calls or for the investigation of false or intentionally misleading reports of incidents requiring emergency service.
b. (Deleted by amendment P.L.1999, c. 125).
c. No telephone company, person providing commercial mobile radio service as defined in 47 U.S.C.s. 332(d), public safety answering point, or manufacturer supplying equipment to a telephone company, wireless telephone company, or PSAP, or any employee, director, officer, or agent of any such entity, shall be liable for damages to any person who uses or attempts to use the enhanced 9-1-1 service, wireless 9-1-1 service or wireless enhanced 9-1-1 service established under this act for release of the information specified in this section, including non-published telephone numbers. This limitation of liability is inapplicable if such failure resulted from a malicious purpose or a wanton and willful disregard for the safety of persons or property.
d. No telephone company, person providing commercial mobile radio service as defined in 47 U.S.C.s. 332(d), public safety answering point, or manufacturer supplying equipment to a telephone company, wireless telephone company, or PSAP, or any employee, director, officer, or agent of any such entity, shall be liable to any person for civil damages, or subject to criminal prosecution resulting from or caused by any act, failure or omission in the development, design, installation, operation, maintenance, performance or provisioning of any hardware, software, or any other aspect of delivering enhanced 9-1-1 service, wireless 9-1-1 service or wireless enhanced 9-1-1 service. This limitation of liability is inapplicable if such failure resulted from a malicious purpose or a wanton and willful disregard for the safety of persons or property.
e. No telephone company, person providing commercial mobile radio service as defined in 47 U.S.C.s. 332(d), public safety answering point, or manufacturer supplying equipment to a telephone *1126 company, wireless telephone company, or PSAP, or any employee, director, officer, or agent of any such entity, shall be liable to any person for damages resulting from or in connection with such entity's provision of any lawful assistance to any investigative or law enforcement officer of this State or a political subdivision of this State, of the United States, or of any other state or a political subdivision of such state in connection with any lawful investigation by or other law enforcement activity of the law enforcement officer unless the entity, in providing such assistance, acted in a manner exhibiting wanton and willful disregard for the safety of persons or property.
[N.J.S.A. 52:17C-10 (emphasis added).]
The Sponsors' Statement accompanying the 1999 legislation is significant. After commenting that the 1999 amendments were designed to reestablish the 1986 9-1-1 Commission as a permanent Commission, as required by the Federal Communications Commission, and add wireless telephone providers to the 9-1-1 network, the sponsors commented that the 1999 revisions to the immunity provisions that had existed since 1989 had another objective, namely: "expand[ing] [the] limitation of liability." Sponsors' Statement, Statement to S.B. No. 1495 (Nov. 16, 1998). The Sponsors' Statement provided:
The bill makes additional changes in existing law in order to recognize the FCC requirement that E9-1-1 service be provided by wireless telephone companies. The bill requires each wireless telephone company providing service within the State to provide wireless enhanced 9-1-1 service pursuant to FCC wireless E9-1-1 requirements and includes wireless telephone companies and wireless enhanced 9-1-1 service in the original legislation. The bill also provides for an expanded limitation of liability for telephone companies, wireless telephone companies and other entities in connection with enhanced 9-1-1 service or wireless enhanced 9-1-1 service and in connection with supplying assistance to investigative or law enforcement officers.

[Ibid.]
After its introduction, S-1495 was reviewed by three legislative committees, the Senate Law and Public Safety Committee, the Assembly Policy and Regulatory Oversight Committee and the Assembly Appropriations Committee. On the immunity issue, both of the Assembly Committee Statements made the same observation:
Finally, the bill alters the existing limitation of liability language to include wireless enhanced 9-1-1 service, except in the event of wanton or willful disregard for the safety of persons or property.
[Assembly Policy & Regulatory Oversight Committee, Statement to Senate, No. 1495, 1-2 (March 18, 1999); Assembly Appropriations Committee, Statement to Senate, No. 1495, 1-2 (May 3, 1999).]
The Senate Law and Public Safety Committee described the purpose of the 1999 amendment to the immunity provisions somewhat differently:
The committee also amended the bill by adding a definition of wireless 9-1-1 service, by altering the limitation of liability language to include wireless 9-1-1 service, in addition to enhanced 9-1-1 service and wireless enhanced 9-1-1 service, and by providing that the limitation of liability would be inapplicable in the event of wanton or willful disregard for the safety of persons or property. [Senate Law & Public Safety Committee, Statement to Senate, No. 1495 with committee amendments, 2 (January 25, 1999) (emphasis added).]
*1127 Although we will discuss the significance of the legislative history of N.J.S.A. 52:17C-10 in greater detail later in this opinion, several initial themes are clear: 1) the sponsors of the 1999 revision observed that expanding the immunity provisions of the statute was one of two principal purposes underlying the 1999 amendment, the other being the addition of wireless telephone service providers as one of the entities entitled to immunity; 2) the 1999 amendments deleted subsection (b), which was part of the 1989 version of the statute, and which had broadly conferred immunity for acts or omissions in the "rendering" of the PSAP services; 3) the 1999 amendments replaced subsection (b) with a more detailed immunity provision describing the circumstances under which immunity would attach; 4) the immunity for PSAPs and providers was broadened in 1999 to include an immunity from criminal liability, rather than merely the civil liability that was included in the 1989 version of the statute; 5) the threshold for forfeiting the benefit of the immunity was changed from acts not committed in "good faith," in the 1989 version, to "wanton and willful disregard for the safety of persons or property," in the 1999 version; and 6) the immunity was broadened in the 1999 amendments so that it now extends to "any person" filing a claim for damages, see N.J.S.A. 52:17C-10(d) and (e), rather than merely those persons who seek damages after their own "use[]" of the 9-1-1 system, which is how the immunity was described in the 1989 version of the statute. This last change now entitles a PSAP to assert immunity even if the person who is actually involved in the emergency and in need of the 9-1-1 service is not the same person who, in the 1989 parlance, "use[d]" the 9-1-1 system by initiating the telephone call.
The language of N.J.S.A. 52:17C-10 demonstrates, and the parties do not dispute, that its obvious purpose is to afford immunity for various aspects of providing enhanced 9-1-1 services. Subsection (a) does not itself establish any immunity. Instead it sets the stage for the three subsections that follow by requiring telephone companies to release to PSAPs the telephone number and street address "of any telephone used to place a 9-1-1 call." Subsection (a) limits the uses to which such subscriber information can be put: "responding to emergency calls" or "investigat[ing] . . . false or intentionally misleading" 9-1-1 calls. N.J.S.A. 52:17C-10(a).
With the stage thus set, the statute proceeds to subsections (c), (d) and (e). In subsection (c), the Legislature has granted immunity to providers of telephone service[5] and to PSAPs for the release of the caller's subscriber information, as described in subsection (a), unless such release of information was for a "malicious purpose" or done in "willful disregard for the safety of persons or property." N.J.S.A 52:17C-10(c). Subsection (c) has no bearing on this appeal and requires no further discussion.
Subsection (d), in contrast, is the section upon which the City principally relies. Subsection (d) begins by granting immunity to telephone companies and to PSAPs and to their employees for liability caused by a wide array of technical and mechanical failures. In particular, subsection (d) grants criminal and civil immunity from the consequences of any "act, failure or omission in the development, design, installation, operation, maintenance, performance *1128 or provisioning of any hardware [or] software. . . ." N.J.S.A. 52:17C-10(d).
As is evident from the language it chose, the Legislature sought, at least in this portion of subsection (d), to confer immunity for what can broadly be described as equipment failures or defects in product design. None of the language we have just quoted from subsection (d) is remotely suggestive of a legislative intent to immunize a call taker such as Venable, or a dispatcher such as Mike, from the consequences of their mishandling of a 9-1-1 call. Stated differently, the language we have quoted would not immunize a PSAP from liability for the negligence of the PSAP employees in their response to, and the handling of, an incoming 9-11 call, which the City concedes.
The City argues, however, that the next phrase, which immediately follows the language we have already quoted, does provide such immunity. The phrase upon which the City relies is:
No . . . PSAP . . . shall be liable . . . for. . . any other aspect of delivering enhanced 9-1-1 service, wireless 9-1-1 service or wireless enhanced 9-1-1 service.

[N.J.S.A. 52:17C-10(d) (emphasis added).]
We must decide whether the term "any other aspect of delivering enhanced 9-1-1 service" means the actual handling of the 9-1-1 call, as the City argues, or whether, instead, it merely refers to other, but unnamed, forms of equipment failure similar to those that have already been listed in subsection (d), which is what plaintiff contends.
The City argues that the term "delivering" in subsection (d) immunizes a broad spectrum of negligent conduct and that the word's placement in proximity to language such as "design," "installation," "operation," "maintenance" and "provisioning of. . . hardware"  all of which apply merely to the mechanical operation of a PSAP nonetheless immunizes a PSAP for the negligent "delivery," or rendering, of PSAP services.
At appellate oral argument, we asked the City whether there was any significance to the Legislature's 1999 substitution of the phrase "delivering . . . 9-1-1 service" for the phrase "rendering PSAP services," which appeared in both the 1989 and 1996 versions of the statute. In its post-argument brief,[6] the City answered in the negative, arguing that none of the versions of the 9-1-1 statute has ever made a distinction between the terms "delivering" and "rendering" of 911 services. The City argues that a review of the statute's legislative history does not support the contention that immunity is only applicable to individuals and entities responsible for the mechanics of 9-1-1 services, such as hardware, software or computerized release of information.
The City also maintains that a PSAP employee is not responsible for the mechanical transmission of 9-1-1 information, as distinguished from employees of a telephone or mobile telephone company. Instead, PSAP employees decide which emergency entity should receive the information garnered from a 9-1-1 call. This decision-making duty, according to the City, is encompassed in the "delivery" of the 9-1-1 services rendered by a PSAP employee. Thus, because the statute's legislative history does not show any material difference between the terms "rendering" *1129 and "delivering," the City argues that we should "apply the plain meaning and logical interpretation of the term `delivery' to find that N.J.S.A. 52:17C-10(d) provides immunity to the City of Newark for the acts or omissions of its PSAP employees, Venable and Mike."
The City also relies upon subsection (e), urging us to conclude that the subsection's provision of immunity for a PSAP's "lawful assistance to any investigative or law enforcement officer . . . in connection with any [police] investigation" immunizes the City for Venable's and Mike's activity. In particular, the City maintains that by dispatching a "walking unit," "running" Honrath's license plate and "producing a printout of the make, model and ownership of the vehicle," Mike rendered "lawful assistance," N.J.S.A. 52:17C-10(e), to police in their investigation of Massachi's abduction. The same is true, the City maintains, for Venable, who "inputted the information for transmittal to the police," even though she did so incorrectly.
Plaintiff disagrees and argues:
Essentially, subsections (d) and (e) address the technical failure of the 9-1-1 system at different points in time during the process of a 9-1-1 call. Subsection (d) relates to the first part of a 9-1-1 call where the information is being provided to the PSAP and subsection (e) addresses the next step in the 9-1-1 process, where the PSAP may be providing information to police departments or other entities, depending on the nature of the call.
Plaintiff also maintains that if the immunity provisions of subsections (d) and (e) were meant to be applied to the negligent handling of the 9-1-1 call itself, then there would be no reason to include the following entities within those immunity provisions: "telephone company," "person providing commercial mobile radio services," "manufacturer supplying equipment to a telephone company," or "wireless telephone company." According to plaintiff, "these entities are included collectively with PSAPs, as the immunity provided under these subsections relates solely to mechanical delivery of the 9-1-1 service, as opposed to the proper processing of the call itself."
Plaintiff also argues that the legislative history does not support the expansive reading of subsections (d) and (e) that the City urges. Plaintiff maintains that the legislation must be construed in light of the purposes for which the 1986 Commission's proposed package of legislation was drafted, which the Commission's cover letter to Governor Kean described as: to "provide for a single, universal Statewide 9-1-1 emergency reporting system in New Jersey which will reduce response time to emergencies, thereby saving lives and property." Report, supra, at i. In the same vein, plaintiff points out that when Governor Kean signed N.J.S.A. 52:17C-1 to -16 into law in 1989, his News Release described the benefits of the new 9-1-1 emergency system but made no mention of N.J.S.A. 52:17C-10's immunity provisions.
Plaintiff notes that although subsection (b) of the 1989 version of N.J.S.A. 52:17C-10 provided expansive immunity for any "act or . . . omission . . . while . . . rendering PSAP services," that broad immunity was abrogated when the Legislature amended the statute in 1999 and deleted subsection (b). Plaintiff maintains that the 1999 amendments, which resulted in the current version of the statute, were not intended to provide "blanket" immunity. Plaintiff argues:
If the Legislature intended such a sweeping expansion of immunity for 9-1-1 operators, then it would have been prominently stated in the legislative history. It is also significant, to the extent *1130 that former subsection (b) arguably could have been interpreted as providing immunity in the processing of the 9-1-1 call itself, that subsection was deleted and replaced with subsections (d) and (e).
Plaintiff also argues that the placement of this statute in an entirely different Title of the statutes than the Tort Claims Act, N.J.S.A. 59:1-1 to 12-3, is significant. Plaintiff observes that the Tort Claims Act provides specific immunities in the area of police activities and other public entity action and it "does not make any sense that subsection (e) of the subject statute buried in Title 52 would provide a greater immunity for police personnel, such as Ms. Venable and dispatcher George Mike, than that provided by Title 59." According to plaintiff, it is more likely that this immunity provision contained in N.J.S.A. 52:17C-10(e) was "meant to apply to similar factual scenarios contemplated by the Tort Claims Act immunity where the various entities would not be responsible for inadequate or faulty equipment."
Last, plaintiff maintains that Venable and Mike were acting not only as a PSAP, but also as a "public safety agency," see N.J.S.A. 52:17C-1(j), for which N.J.S.A. 52:17C-10 affords no immunity.

III.
"Our task in statutory interpretation is to determine and effectuate the Legislature's intent." Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 553, 964 A.2d 741 (2009) (citation omitted). In determining legislative intent, we remain mindful of the command of N.J.S.A. 1:1-1, which requires us, when construing a statute, to give words and phrases "their generally accepted meaning" unless doing so is plainly "inconsistent with the manifest intent of the legislature or unless another or different meaning is expressly indicated." Therefore, we must "`look first to the plain language of the statute, seeking further guidance only to the extent that the Legislature's intent cannot be derived from the words that it has chosen.'" In re Petition for Referendum on Trenton Ordinance 09-02, 201 N.J. 349, 358-59, 990 A.2d 1109 (2010) (quoting Bosland, supra, 197 N.J. at 553, 964 A.2d 741).
As the Court observed in Trenton Ordinance, "`[a] court should not resort to extrinsic interpretative aids when the statutory language is clear and unambiguous, and susceptible to only one interpretation.'" Id. at 359, 990 A.2d 1109 (quoting DiProspero v. Penn, 183 N.J. 477, 492, 874 A.2d 1039 (2005)).
However, when the language of a statute is susceptible to more than one meaning or interpretation, we will look to "extrinsic secondary sources to serve as [a] guide." Bosland, supra, 197 N.J. at 553, 964 A.2d 741. The sources to which we look as aids in interpretation of a statute include "legislative history, statements of the sponsor or sponsors of bills that were enacted, and, where relevant, a Governor's press release or . . . conditional veto message." Id. at 553-54, 964 A.2d 741 (internal citations omitted). "Regardless of whether the language is plain or whether ambiguities cause us to seek guidance from sources other than words the Legislature has chosen, our `primary task . . . is to effectuate the legislative intent in the light of the language used and the objects sought to be achieved.'" Id. at 554, 964 A.2d 741 (quoting State v. Hoffman, 149 N.J. 564, 578, 695 A.2d 236 (1997)) (alteration in the original).
As Trenton Ordinance requires, our starting point must be the actual language of the statute. Supra, 201 N.J. at 358-59, 990 A.2d 1109. We view the statute as a whole, and do not analyze any one *1131 section in isolation. Id. at 359, 990 A.2d 1109.
With these principles as a backdrop, we turn to the task of interpreting N.J.S.A. 52:17C-10(d) and (e) to determine whether either, or both, subsections immunize the City for Venable's and Mike's negligence in their handling of the 9-1-1 call that described Sohayla Massachi's abduction. In subsection (d), we must determine whether the word "delivering" contained in the phrase "any other aspect of delivering enhanced 9-1-1 service" is "susceptible to only one interpretation." Trenton Ordinance, supra, 201 N.J. at 359, 990 A.2d 1109 (internal quotation omitted). Specifically, we must determine whether the term has a "generally accepted meaning" in the context in which it is used in the statute. N.J.S.A. 1:1-1.
The word "delivery" can mean "to send. . . to an intended . . . destination" as well as "to produce the promised, desired or expected results." Webster's Ninth New Collegiate Dictionary 336 (1985). Thus, as applied to the statute under review, the term "delivering" could signify the mechanical transmission of the 9-1-1 call, if the first meaning, urged by plaintiff, is applied. However, if the second meaning, urged by the City is applied, "delivering" would mean the qualitative manner in which the 9-1-1 calltaker chooses to respond to the call, i.e., the manner in which the 9-1-1 service is rendered by the 9-1-1 calltaker and dispatcher.
However, we must not view the term "delivery" in isolation. We must instead consider the entire phrase. The Legislature has conferred immunity for "any other aspect of delivering enhanced 9-1-1 service, wireless 9-1-1 service or wireless enhanced 9-1-1 service." N.J.S.A. 52:17C-10(d). It did not confer immunity for "any other aspect of delivering" PSAP services. We view this distinction as significant. See Bd. of Educ. v. Bd. of School Estimate, 95 N.J.Super. 284, 287, 230 A.2d 895 (App.Div.1967) (holding "the difference in the choice of words reflects the intention of the Legislature"). The terms "enhanced 9-1-1 service," "wireless 9-1-1 service" and "wireless enhanced 9-1-1 service" are all defined so as to apply only to the actual telephone components that constitute the 9-1-1 service and not to the calltakers' response to the call. N.J.S.A. 52:17C-1 defines "enhanced 9-1-1 service" as follows:
a service consisting of telephone network features and public service answering points provided for users of the public telephone system enabling the users to reach a public service answering point by dialing the digits "9-1-1." The service directs 9-1-1 calls to appropriate public safety answering points by selective routing based on the location from which the call originated and provides for automatic number identification and automatic location identification features[.]
[N.J.S.A. 52:17C-1(g).]
"Wireless 9-1-1 service" is defined as:
the service which enables wireless telephone company customers to dial the digits 9-1-1 and be connected to a public safety agency[.]
[N.J.S.A. 52:17C-1(r).]
"Wireless enhanced 9-1-1 service" is defined as:
the service required to be provided by a wireless telephone company pursuant to FCC wireless E9-1-1 requirements[.]
[N.J.S.A. 52:17C-1(s).]
The City maintains that none of these functions, selective routing, automatic telephone number identification or automatic location identification, are performed by a PSAP. Therefore, according to the City, the Legislature's decision to include *1132 PSAPs in the list of entities entitled to immunity in subsection (d) would make no sense unless the words "or any other aspect of delivering enhanced 9-1-1 service" were to be construed as affording immunity for the bungled response to a 9-1-1 call. The premise of the City's argument is flawed because, contrary to the City's contention, PSAPs do have responsibility for operating and maintaining the actual telephone network. That obligation is imposed by N.J.S.A. 52:17C-8(c), which specifically requires "[e]ach entity operating a public safety answering point" to "be responsible for operating[] and maintaining" the actual 9-1-1 equipment. The statute provides:
Each entity operating a public safety answering point shall be responsible for obtaining, operating, and maintaining enhanced 9-1-1 termination equipment. The operations and maintenance of this equipment shall be in accordance with standards set forth by the office[7] pursuant to section 3 of this act[.]
[N.J.S.A. 52:17C-8(c).]
Thus, PSAPs play a central role in the mechanical delivery of PSAP services. For that reason, we squarely reject the City's claims that: "[a] PSAP, unlike a telephone company, does not provide the mechanism for delivery of 911 services"; "a PSAP employee is not responsible for the mechanical transmission of 9-1-1 information, as distinguished from employees of a telephone or mobile company"; and "[i]nstead, PSAP employees [merely] decide what emergency entity should receive the information garnered from a 911 call." As is evident from the language of N.J.S.A. 52:17C-8, the City's PSAP does far more than merely route the call. The City's PSAP also "operat[es] and maintain[s]" the very 9-1-1 equipment that the PSAP uses in receiving and handling the 9-1-1 call.
No doubt, it was because PSAPs are involved in operating and maintaining the telephone equipment that the Legislature included PSAPs in its listing of parties who are granted immunity in subsection (d) for equipment and maintenance failures. Subsection (d) begins by designating the parties entitled to such immunity and lists them as follows:
telephone company, person providing commercial mobile radio service as defined in 47 U.S.C.s 332(d), public safety answering point, or manufacturers supplying equipment to a telephone company, wireless telephone company, or PSAP, or any employee, director, officer or agent of any such entity. . . .
[N.J.S.A. 52:17C-10(d) (emphasis added).]
After this listing of parties entitled to immunity, subsection (d) proceeds to a description of the scope of that immunity:
damages . . . caused by any act, failure or omission in the development, design, installation, operation, maintenance, performance or provisioning of any hardware, software, or any other aspect of delivering enhanced 9-1-1 service, wireless 9-1-1 service or wireless enhanced 9-1-1 service.
[N.J.S.A. 52:17C-10(d).]
Thus, when we consider the fact that, pursuant to N.J.S.A. 52:17C-8, PSAPs play as much of a role in the mechanical "delivering" of 9-1-1 services as do the other entities that are listed in subsection (d), it stands to reason that the phrase "or any other aspect of delivering enhanced 9-1-1 *1133 service" in subsection (d) would apply with equal force to PSAPs and to the telephone companies and manufacturers that are listed along with PSAPs in that subsection. It also stands to reason that the Legislature would not have ascribed a different meaning to the term "delivering" when applied to telephone companies and manufacturers, than it applied to PSAPs.
In particular, telephone companies and manufacturers "deliver" the 9-1-1 services enumerated in subsection (d) because, in the words of subsection (d), they "design, install[], operat[e], [and] maint[ain]" 9-1-1 services. It is those tasks for which they are granted immunity by N.J.S.A. 52:17C-10(d). But, PSAPs likewise design, install, operate and maintain the telephone equipment, as required by N.J.S.A. 52:17C-8. Thus, the phrase "or any other aspect of delivering enhanced 9-1-1 service" in subsection (d) likely has the same meaning for PSAPs as it does for the other entities listed there. We will not ascribe to the Legislatureespecially in the absence of any legislative history so statingan intention to have created such a radical shifting of meanings in a single portion of one subsection.
Were we to accept the City's argument, we would be forced to conclude that the Legislature intended the term "delivering" in subsection (d) to refer to mechanical delivery of services when the term "delivering" is applied to telephone companies and manufacturers, but intended the term "delivering" to mean the actual response to the call when applied to PSAPs. We will not accept such a tortured interpretation of the statute. See State v. Serrone, 95 N.J. 23, 29-30, 468 A.2d 1050 (1983).
Moreover, were we to accept the City's argument that "delivery" in subsection (d) means only the handling of the call and the dispatching of the needed emergency servicewhich are functions that are not performed by telephone companies and manufacturers and are only performed by PSAPswe would be forced to conclude that the phrase "or any other aspect of delivering enhanced 9-1-1 service" only applies to PSAPs even though nothing in the language of subsection (d) remotely suggests an intention to afford different immunities to PSAPs than to the other entities listed there.
For all of these reasons, we conclude that the phrase "or any other aspect of delivering enhanced 9-1-1 service, wireless 9-1-1 service or wireless enhanced 9-1-1 service" in subsection (d) refers to any other aspect of the very same functions that are described in the phrases that immediately precede it: "the development, design, installation, operation, maintenance, performance or provisions of any hardware, software. . . ." N.J.S.A. 52:17C-10(d).
Such a construction of subsection (d) is also consistent with one of the leading canons of statutory construction, ejusdem generis, which specifies that "`where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.'" Gallenthin Realty Dev., Inc. v. Borough of Paulsboro, 191 N.J. 344, 367, 924 A.2d 447 (2007) (quoting 2A Norman J. Singer, Sutherland Statutory Construction § 47:17 (6th ed. 2000)).
Applying the ejusdem generis canon leads to the conclusion that the phrase "or any other aspect of delivering enhanced 9-1-1 service" in subsection (d) should be interpreted in like fashion as the words that immediately precede it, which are "development, design, installation, operation, maintenance, performance or provisioning of any hardware[] [or] software," N.J.S.A. *1134 52:17C-10(d). All of these words pertain to the mechanical or logistical aspects of delivering 9-1-1 service, and not to the handling of the 9-1-1 call and the dispatching of emergency police, fire or ambulance services.
Thus, under the ejusdem generis canon, the term "delivery" could only refer to immunity from liability for any mechanical failures in the delivery of a 9-1-1 call, and not to negligence in the actual rendering of the 9-1-1 emergency dispatch service. However, we do not apply a canon of statutory interpretation in a vacuum because our "`primary task . . . is to effectuate the legislative intent in light of the language used and the objects sought to be achieved.'" Bosland, supra, 197 N.J. at 554, 964 A.2d 741 (quoting Hoffman, supra, 149 N.J. at 578, 695 A.2d 236) (alteration in original). Therefore, before reaching any final conclusions on the interpretation of subsection (d), we turn to an analysis of the "`objects sought to be achieved,'" ibid., by the 1999 amendments to N.J.S.A. 52:17C-10.
The principal method of ascertaining legislative intent, when the language of the statute is ambiguous, is by analyzing the legislative history. Id. at 553, 964 A.2d 741 As we have already observed, the sponsors, as well as the three Committees that considered the amendments to the immunity legislation, all commented that the 1999 amendment was designed to expand the immunity provision. Indeed, the 1999 amendments accomplish the very objectives that the sponsors and the two Committee statements describeexpanding the immunity provisions. The 1999 amendments expanded the immunity provisions in six critical respects. In particular, subsections (d) and (e) of the 1999 amendments: 1) added immunity from criminal liability to supplement the civil liability that was established in 1989; 2) narrowed the conduct that would cause a forfeiture of statutory immunity, by changing lack of "good faith" in the 1989 version to "act[ing] in a manner exhibiting wanton and willful disregard for the safety of persons or property" in the 1999 amendments; and 3) extended the persons against whom PSAPs, manufacturers and telephone companies can assert the immunity by changing "any person who uses the enhanced 9-1-1 service" in the 1989 version to "any person" in the 1999 amendments.
The 1999 amendments also 4) broadened the type of conduct for which PSAPs and other entities could claim immunity, by changing "failure of any equipment or procedure" and "act or omission committed while in the training for or in rendering PSAP services" in the 1989 version to "any act, failure or omission in the development, design, installation, operation, maintenance, performance or provisioning of any hardware, software, or any other aspect of delivering enhanced 9-1-1 service, wireless 9-1-1 service or wireless enhanced service" in the 1999 amendments; 5) added the delivery of wireless 9-1-1 services to the types of telephone service for which the immunity applied; and 6) added an entirely new subsection, namely subsection (e), which extends immunity for damages resulting from an "entity's provision of any lawful assistance to any investigative or law enforcement officer."
As is evident from the six factors we have identified, the 1999 amendments to N.J.S.A. 52:17C-10 effectuated a wideranging expansion of the immunity conferred by N.J.S.A. 52:17C-10. We therefore do not agree with the City's argument that interpreting the phrase "or any other aspect of delivering enhanced 9-1-1 service" as meaning only the mechanical delivery of services would narrow the immunity that was contained in the 1989 version of the statute.
*1135 Moreover, if we broaden our inquiry to consider the purposes of the adoption of the 9-1-1 legislation in 1989, our conclusion that the City's arguments misconstrue subsection (d) becomes even stronger. The Legislature's objective in enacting the entire package of bills in 1989 was to improve the provision of emergency response service in the State by eliminating the defects in the emergency response system that had existed since 1967. Report, supra, at 4-7. That objective was accomplished by adding the enhanced 9-1-1 features we have already described. See supra, note 3. The Legislature's goal of providing enhanced emergency response capability to the citizens of this State would not have been advanced by a statute that immunized municipalities from liability for the mishandling, or the bungling, of an emergency call.
To the contrary, the purposes the Legislature sought to achieve when it enacted the package of enhanced 9-1-1 service legislation in 1989 would indeed have been undermined by an interpretation of subsection (d) that would immunize PSAPs for their negligent response to 9-1-1 calls. Therefore, we conclude that the "`objects sought to be achieved'" by the legislation, Bosland, supra, 197 N.J. at 554, 964 A.2d 741 (quoting Hoffman, supra, 149 N.J. at 564, 695 A.2d 236), support the conclusion that the immunity conferred by subsection (d) for "any other aspect of delivering enhanced 9-1-1 service," N.J.S.A. 52:17C-10(d), is limited to acts or omissions in the mechanical delivery of the call, such as wiring problems, software defects, dropped calls, power outages, switching problems and similar maintenance or operational problems.
The City argues that such a construction of subsection (d) would result in a narrowing of the immunity afforded by the 1989 version of the statute, which conferred immunity for "failure of any equipment or procedure in connection with the enhanced 9-1-1 service" andmore importantly "for an act or omission of an act committed. . . in rendering PSAP services in good faith and in accordance with the act." N.J.S.A. 52:17C-10(b) (repealed by L. 1999, c. 125.) (emphasis added). The City argues that: the term "rendering" included the mechanical delivery of 9-1-1 service and the actual handling of the call and dispatch of emergency services; and that nothing in the legislative history of the 1999 amendments evinces a legislative intent to narrow the broad immunity conferred by the 1989 statute.
We agree that the term "any act committed. . . in rendering PSAP services" in the repealed subsection (b) of the 1989 statute might theoretically be susceptible of a broader interpretation than "or any other aspect of delivering enhanced 9-1-1 service, wireless 9-1-1 service or wireless 9-1-1 enhanced service," as subsection (d) now provides. But that is only true if the "rendering" language of the 1989 statute is viewed in isolation. If, however, the "rendering" language in the 1989 statute is read in conjunction with the balance of subsection (b) of the 1989 version of the statute, and compared to the entirety of the 1999 amendments to N.J.S.A. 52:17C-10, it is clear that interpreting subsection (d) in the fashion we have discussed would not narrow the immunity conferred by the statute. We now compare the 1989 and the 1999 versions of N.J.S.A. 52:17C-10.
Subsection (b) of the 1989 statute began by immunizing telephone companies, PSAPs and manufacturers for damages caused by the release of information such as non-published telephone numbers. That immunity was carried forward into what is now subsection (c), which affords immunity for the "release of the information *1136 specified in this section, including non-published telephone numbers." N.J.S.A. 52:17C-10(c).
The next portion of the former subsection (b) extended immunity "for failure of any equipment or procedure in connection with the enhanced 9-1-1 service." That section is the source for the present subsection (d), which likewise affords immunity for negligence in connection with the failure of any equipment or procedure, because it affords immunity in connection with the "development, design, installation, operation, maintenance, performance or provisioning of any hardware, software or any other aspect of delivering enhanced 9-1-1 service. . . ." N.J.S.A. 52:17C-10(d).
The remaining portion of the former subsection (b)"in rendering PSAP services in good faith" is the source for the present subsection (e), which affords immunity for assistance provided to law enforcement. While the "rendering PSAP services" of the 1989 version is not entirely congruent with the present subsection (e), we would not expect it to be so, or there would have been no need to amend the statute in 1999. Our side-by-side comparison of the 1989 and 1999 versions satisfies us that the "rendering PSAP services" language in the 1989 version of subsection (d) has not been narrowed or restricted by the 1999 amendments.
There is a final reason why we conclude that the immunity conferred by N.J.S.A. 52:17C-10(d) is limited to negligence in the mechanical aspects of delivering 9-1-1 service. The interpretation urged by the Citythat the immunity conferred by subsection (d) broadly extends to a calltaker's negligent inputting of data and the dispatcher's error in the dispatch of police responderswould, if accepted, result in an enormous abridgement of the common law right to seek redress for injury caused by the negligence of others. When two interpretations of a statute are possible, the one that has the lesser impact on the common law right to seek redress through the courts is the interpretation we should generally adopt because "`a statute in derogation of the common law'" must be "`strictly construed,'" In re Estate of Cosman, 193 N.J.Super. 664, 671, 475 A.2d 659 (App.Div.1984) (quoting Dacunzo v. Edgye, 19 N.J. 443, 451, 117 A.2d 508 (1955)), unless the Legislature plainly intended a broader scope. Ibid.
For all of these reasons, we hold that the immunity N.J.S.A. 52:17C-10(d) affords PSAPs and their employees is limited to negligence in the mechanical delivery of 9-1-1 services, such as errors or omissions in the operation, maintenance, design or performance of the 9-1-1 telephone equipment. The immunity afforded by subsection (d) does not extend to the conduct at issue here, namely, the bungled response to an incoming 9-1-1 call.
We turn next to the interpretation of subsection (e). The text of subsection (e) provides immunity to PSAPs for negligence in the "provision of any lawful assistance to any investigative or law enforcement officer . . . in connection with any lawful investigation . . . or other law enforcement activity. . . ." N.J.S.A. 52:17C-10(e). Such "assistance" could include responding to a police request that additional police units be dispatched, that an ambulance be sent to the scene, that a warrant check be performed or that a license plate be "run" to determine to whom a car is registered. Subsection (e) is obviously intended to immunize PSAPs for any negligence in rendering such assistance to police once police have commenced an investigation.
Such an interpretation of subsection (e) is congruent with the Sponsors' Statement that the 1999 amendments "provide[d] for *1137 an expanded limitation of liability for telephone companies . . . and other entities. . . in connection with supplying assistance to . . . law enforcement officers." Sponsors' Statement, Statement to S.B. No. 1495 (Nov. 16, 1998). Prior to the 1999 amendments, immunity was provided only in connection with liability for release of unpublished telephone numbers, equipment failures and the "rendering" of PSAP services. N.J.S.A. 52:17C-10(b) (repealed by L. 1999, c. 125). The 1989 version of the statute would not have included immunity for any negligence in assisting law enforcement in any investigation. Thus, the 1999 amendment to the statute, which added subsection (e), represents an "expanding" of the immunity provisions of the statute, exactly as the sponsors commented. We therefore conclude that in the absence of the "wanton" behavior that leads to a forfeiture of immunity, subsection (e) immunizes a PSAP and its employees from negligence in the assistance provided by the PSAP to law enforcement in connection with any lawful police activity or law enforcement investigation.
We turn now to the task of applying our interpretation of subsections (d) and (e) to the facts that existed at the time the judge denied the City's motion for summary judgment based on N.J.S.A. 52:17C-10. We have concluded that subsection (d) does not provide immunity from the consequences of a PSAP's negligence in responding to a request for emergency services, and does not provide immunity for negligence in the way the PSAP employees input the information received from the caller and the way they dispatch police units in immediate response to the 9-1-1 call. Therefore, N.J.S.A. 52:17C-10(d) does not include immunity for the negligent acts committed by Venable and Mike: inputting an incorrect description of Honrath's vehicle; failing to note that Honrath's vehicle was in motion; failing to keep Lester on the telephone so she could update Venable on the vehicle's route of travel; failing to issue a general alert; and failing to notify Westfield police of the abduction. We hold that the City and its PSAP were not afforded immunity under N.J.S.A. 52:17C-10(d) for any of these negligent acts.
Nor does subsection (e) afford any benefit to the City under the facts presented here. At the time Venable and Mike mishandled the incoming call from Lester concerning Massachi's abduction, there was no police investigation underway. Nor had police requested any assistance from Venable or Mike. Indeed, not until Honrath's roommate called Westfield police, by which time Honrath had already arrived at the apartment with Massachi, were police even notified. Thus, although Venable and Mike were negligent, their negligence did not arise while providing "assistance to law enforcement . . . in connection with any lawful investigation by or other law enforcement activity of the law enforcement officer." N.J.S.A. 52:17C-10(e). The City is consequently not afforded immunity under subsection (e). Therefore, the Law Division correctly denied the City's motion to dismiss plaintiff's complaint because neither subsection (d) nor subjection (e) provide immunity under the facts presented here. We affirm the order so providing.
[At the direction of the Court, Parts IV to VI of the opinion are not published.]

VII.
On the appeal, affirmed in part, reversed in part and remanded for a new trial on liability and proximate cause only.
On the cross-appeal, affirmed in part.
NOTES
[1] Defendant is the City of Newark. It is improperly pled as the City of Newark Police Department.
[2] N.J.S.A. 52:17C-1(l) defines a PSAP as "the first point of reception by a public safety agency of 9-1-1 calls and serves the jurisdictions in which it is located or other participating jurisdictions."
[3] The "enhanced" 9-1-1 system the Commission recommended had three new features: automatic number identification, which enables the automatic display of the seven-digit telephone number from which the 9-1-1 call originated; "automatic location identification," which automatically displays the geographic location from which the 9-1-1 call was made; and "selective routing," which is the method employed to direct 9-1-1 calls to the appropriate PSAP based on the location from which the call originated. Report, supra, at 7.
[4] 47 U.S.C. § 332(d) defines a "commercial mobile service" as "any mobile service . . . that is provided for profit and makes interconnected service available (A) to the public or (B) to such classes of eligible users as to be effectively available to a substantial portion of the public[.]"
[5] The enumerated providers include telephone companies, commercial mobile radio service companies, telephone equipment manufacturers and wireless telephone companies.
[6] We requested the parties submit post-argument supplemental briefs addressing the legislative history of N.J.S.A. 52:17C-10.
[7] N.J.S.A. 52:17C-3 designates the Office of Emergency Telecommunications Services as the "office" responsible for issuing a Statewide 9-1-1 service plan and for developing "[t]echnical and operational standards."