39 A.3d 177

PARIS WILSON, AN INFANT BY HIS GUARDIAN AD LITEM, SONYA MANZANO, AND D'ARTAGNAN MANZANO, INDIVIDU-ALLY AND AS ADMINISTRATOR OF THE ESTATES OF DE-QUAN WILSON AND DARTAGNANIA WILSON, AND DEQUAN WILSON AND DARTAGNANIA WILSON, INDIVIDUALLY, PLAINTIFFS–RESPONDENTS, v. CITY OF JERSEY CITY, 911 OPERATOR LAURA JEAN PETERSEN (OPERATOR NO. 35) AND 911 OPERATOR BRENDA MURDAUGH–JONES (OPERA-TOR NO. 326), DEFENDANTS–APPELLANTS, AND POLICE OFFICER JOSE M. SANTANA (SHIELD NO. 2853), POLICE OF-FICER ERNEST VIDAL (SHIELD NO. 2395), RADIO DIS-PATCHER MICHAEL EDWARD CLARK, STATE OF NEW JER-SEY, NEW JERSEY STATE POLICE, AND 911 OPERATOR LU ANN BURD, DEFENDANTS, AND CITY OF JERSEY CITY, POLICE OFFICER JOSE M. SANTANA (SHIELD NO. 2853), POLICE OFFICER ERNEST VIDAL (SHIELD NO. 2395), 911 OPERATOR LAURA JEAN PETERSEN (OPERATOR NO. 35),

RADIO DISPATCHER MICHAEL EDWARD CLARK, AND 911 OPERATOR BRENDA MURDAUGH–JONES (OPERATOR NO. 326), DEFENDANTS–THIRD–PARTY PLAINTIFFS, v. DWAYNE WILSON AND 185 MARTIN LUTHER KING DRIVE, LLC; STATE OF NEW JERSEY, NEW JERSEY STATE POLICE, THIRD–PARTY DEFENDANTS.

Argued October 12, 2011—Decided March 8, 2012.

560 

Stephen M. Orlofsky argued the cause for appellant City of Jersey City (*William C. Matsikoudis, Corporation Counsel and Blank Rome,* attorneys; *Mr. Orlofsky, Priti R. Vakharia, Assistant Corporation Counsel, Adrienne C. Rogove,* and *Juli E. Greenberg,* on the briefs).

Robert E. Levy argued the cause for appellants Laura Jean Petersen and Brenda Murdaugh–Jones (*Scarinci Hollenbeck,* attorneys; *Mr. Levy* and *Michael A. Cifelli,* of counsel; *Mr. Levy, Mr. Cifelli* and *Candida J. Griffin,* on the briefs).

Brian C. Harris and Patrick J. Boyle argued the cause for respondents (*Braff Harris & Sukoneck* and *Frankfurt Kurnit Klein & Selz,* attorneys; *Mr. Harris, Mr. Boyle,* and *Lisa A. Herbert,* on the briefs).

Justice ALBIN delivered the opinion of the Court.

In this appeal, we must determine whether 9–1–1 operators, along with their public-entity employers, are statutorily immune from civil liability for the negligent mishandling of emergency calls. The paramount issue before us is the scope of the 9–1–1 immunity statute, *N.J.S.A.* 52:17C–10.

The panels in *Massachi v. City of Newark Police Department,* 415 *N.J.Super.* 518, 522, 2 *A.*3d 1117 (App.Div.2010) and in this case, *Wilson ex rel. Manzano v. City of Jersey City,* 415 *N.J.Super.* 138, 157, 165, 1 *A.*3d 723 (App.Div.2010), concluded that, under *N.J.S.A.* 52:17C–10, 9–1–1 operators are *not* immune for mistakes made when they dispatch police, fire, or first-aid personnel to the scene of an emergency, but are immune for mistakes made when they assist police in an ongoing investigation. Under this construction of the statute, 9–1–1 operators have no immunity for errors committed in carrying out their primary responsibility—dispatching first-responders to the scenes of emergencies, but have immunity for a secondary responsibility—providing assis-

tance to an ongoing police investigation. Under this interpretation of *N.J.S.A.* 52:17C–10, 9-1-1 operators do not share the same statutory immunity that shields police, fire, or first-aid personnel from liability for their missteps in responding to the scene of an emergency.

In this case, the *Wilson* appellate panel overturned the trial court's grant of summary judgment in favor of two 9-1-1 operators, as well as their public employer, who were sued because of their alleged negligent handling of an emergency call reporting a disturbance that, in fact, turned out to be a multiple homicide. We now reverse and remand.

In creating an enhanced 9-1-1 system that would allow police, fire, and first-aid personnel to respond to emergencies, the Legislature mandated the participation of telecommunications companies and governmental entities. In exchange for this compelled cooperation, the Legislature apparently devised a statute, *N.J.S.A.* 52:17C–10, to shield public and private entities, and their personnel, from civil liability for certain acts of ordinary negligence arising from the operation of the 9-1-1 system. No one disputes that these entities and their personnel are not immune for acts or omissions constituting "a wanton and willful disregard for the safety of persons or property." *N.J.S.A.* 52:17C–10(d) and (e).

In light of the language of *N.J.S.A.* 52:17C–10, its legislative history, and the overall objectives of the statutory scheme, we conclude that the enactment confers immunity on the 9-1-1 operators and public entity in this case for any negligence in the "delivery" of 9-1-1 services, including the mishandling of emergency calls. Although we reverse on this issue, we nevertheless remand to the Appellate Division to address an issue it left undecided: whether the conduct of the 9-1-1 operators constituted wanton and willful disregard for the safety of persons, conduct that would deny defendants protection under the 9-1-1 immunity statute.

I.

A.

We begin with some basic principles of law. Our review of the meaning of a statute is *de novo,* and we owe no deference to the interpretative conclusions reached by the trial court and Appellate Division. *Zabilowicz v. Kelsey,* 200 *N.J.* 507, 512–13, 984 *A.*2d 872 (2009); *see also Manalapan Realty, L.P. v. Twp. Comm.,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995). In determining whether summary judgment was properly granted based on the record, we apply the same standard governing the trial court—we view the evidence in the light most favorable to the non-moving party. *See Henry v. N.J. Dep't of Human Servs.,* 204 *N.J.* 320, 330 (2010); *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 523, 666 *A.*2d 146 (1995); *see also R.* 4:46–2(c). Here, the trial court granted summary judgment against plaintiffs, the non-moving parties. With these principles in mind, we now turn to the facts, viewing them in the light most favorable to plaintiffs.

B.

Sometime shortly after 12:00 a.m. on September 20, 2005, Dwayne Wilson carried out a brutal rampage, repeatedly stabbing his sister Marcia Wilson and her three children, Paris, age nine; DeQuan, age eleven; and Dartagnania, age eleven, in their Jersey City apartment located at 207 Wegman Parkway (also known as 185 Martin Luther King Drive). Having survived the attack, Paris lay unconscious until around 9:45 a.m., when he awoke for about an hour. He spoke with his brother, DeQuan, and sister, Dartagnania, who were seriously injured and lying on the floor. His sister asked for water, and his brother told them "to look for the phone." Paris was unable to help them and lapsed back into unconsciousness. The next morning, September 21, when Paris regained consciousness, he retrieved his mother's cellular telephone and called 9-1-1. Shortly afterwards, police officers ar-

rived in the apartment where they found Paris grievously wounded but alive. His mother, brother, and sister were dead.

## C.

At the time of the attack, Anthony Andrews was temporarily living with his sister in an apartment at 207 Wegman Parkway, across the hall from the Wilson family. After hearing a disturbance coming from the Wilson apartment, Andrews called 9–1–1 using his sister's cellular telephone. That call was automatically routed to a New Jersey State Police Public Safety Answering Point (PSAP) [1], commonly referred to as a 9–1–1 call center. At 12:52 a.m., State Police 9–1–1 Operator Lu Ann Burd received Andrews's call: [2]

[Burd]: 9–1–1, where is your emergency?

Andrews: Hello, um, um at *227 Wegman.* We heard somebody screaming next door, inside this building right here.

[Burd]: What town?

Andrews: Jersey City.

[Burd]: Alright hold on I'll connect you into the police department out there, hold on.

[ (Emphasis added).]

At this point, Burd transferred Andrews to the Jersey City Police Department's PSAP, where 9–1–1 Operator Laura Jean Petersen picked up the call. Petersen then took information from Andrews:

[Petersen]: 911 operator 3–5, where is your emergency?

[Andrews]: Uh—*185–Wegman* . . .

[Petersen]: 185 We—

[Andrews]: Yeah, I hear some screamin' and throwing stuff, so *I don't know what's going on next door.* Somebody's fighting or something.

---

[1] A Public Safety Answering Point is "a facility, operated on a 24–hour basis, assigned the responsibility of receiving 9–1–1 calls and, as appropriate, directly dispatching emergency response services or transferring or relaying emergency 9–1–1 calls to other public safety agencies." *N.J.S.A.* 52:17C–1(*l* ).

[2] For ease of reading, PSAP call takers will mostly be referred to as 9–1–1 operators.

[Petersen]: Okay, and that's *185 Wegman Parkway?*

[Andrews]: *Yeah.*

[Petersen]: Okay, we're going to get someone over there as soon as possible, Sir.

[Andrews]: Alright bye.

[Petersen]: Thank you, bye bye now.

[ (Emphasis added).]

Petersen then prepared a computer-aided dispatch (CAD) ticket, a computerized textual narrative of the 9-1-1 call, for transmittal to a Jersey City Police dispatcher.[3] The CAD ticket that Petersen generated contained a number of errors. First, Petersen listed the incorrect address given to her by Andrews: "185 WEGMAN PKWY." Andrews undoubtedly was confused because the building in which he was temporarily residing had two addresses, 207 Wegman Parkway and 185 Martin Luther King Drive. Second, in the narrative portion of the dispatch ticket, Petersen wrote that "[Reporting party] hears screaming coming from the house next door, no further info." Petersen failed to ask Andrews what he meant by "next door" and mistakenly assumed that he was describing an adjacent house rather than an adjacent apartment. Third, Petersen did not ask the caller's name or confirm the telephone number from which he was calling, a violation of the Jersey City Police Department Call Taker Policy and Procedure Manual.[4] Fourth, Andrews called from his sister's cellular phone. Nevertheless, Andrews's telephone number—not his sister's—was automatically generated from his cellular service provider's billing information.[5]

---

[3] The "Call Code F1900" on the CAD ticket was short for "PERSON SCREAMING/CALLING FOR HELP."

[4] The computerized dispatch ticket had a field for the name of the "Reporting Party." Instead of placing a name in that field, Petersen wrote, "NEIGHBOR."

[5] The apparent reason why the CAD ticket did not display Andrews's sister's cellular telephone number is because the siblings' telephones were under a "family plan," in which Andrews's phone was the "pilot number." Accordingly, Andrews's telephone number was automatically displayed on the CAD ticket.

The flawed CAD ticket was forwarded to Jersey City Police Dispatcher Michael Edward Clark, who in turn radioed Officers Jose Santana and Ernest Vidal to "Check 185 Wegman Parkway." In his dispatch, Clark added that "caller states he hears someone screaming from the house next door. I don't know if that's the caller's address."

On their arrival, Officers Santana and Vidal found the building at 185 Wegman Parkway unoccupied. The officers canvassed the immediate area but neither heard nor observed anything to confirm a disturbance. The officers radioed Dispatcher Clark "to have the complainant come out so he can tell us where he hears the yelling coming from." Clark dialed the number on the CAD ticket—Andrews's telephone number—but received a voicemail greeting. Clark hung up without leaving a message. The officers were approximately 200 feet away from the building where the Wilson family resided and Andrews made his call. The officers remained on the scene for approximately a half-hour and, seeing nothing amiss, returned to their patrol of the city.

Approximately twenty-two hours later, around 11:00 p.m. on September 20, 2005, Andrews called 9–1–1 again. This time, the Jersey City Police Department's 9–1–1 operator, Brenda Murdaugh–Jones, answered:

[Murdaugh–Jones]: 9–1–1 emergency Operator 326, where is your emergency?

[Andrews]: Hello, I called the police last night—

[Murdaugh–Jones]: Ex—

[Andrews]: because I heard—Hello?

[Murdaugh–Jones]: Yes, go ahead, what did you say Sir?

[Andrews]: I called the police last night because I heard a little bit of noise and reckin' in the building across the hall. It sounded like somebody was fist—it sounded like somebody was fightin'—(inaudible) something. I called the police last night nobody never came. And then all of a sudden I saw a guy rush out the building jump in his car and skid off in his car, so[,] I don't know what happened next door. So, somebody should have came out and checked. I called the police two times. [T]hey never came.

[Murdaugh–Jones]: Okay Sir, let me stop you right now because I, you know, we give people the opportunity to tell us what the life threatening emergency is, so that's the first question we do ask. Do you have a life threatening emergency that's going on right now?

[Andrews]: Excuse me?

[Murdaugh–Jones]: Do you have a life threatening emergency that's going on right now?

[Andrews]: No it would—

[Murdaugh–Jones]: Alright,

[Andrews]:—it happened last night[.]

[Murdaugh–Jones]: what you're going to do is you're going to dial back on the non-emergency number—okay? The number you need to be dialing is 201–547–

[Andrews]: See they should have come yesterday . . .

[Andrews hangs up.]

After abruptly ending the call, Andrews did not dial the non-emergency number.

The next morning, September 21, when Paris awoke and gathered the strength to call 9–1–1, the police responded to the gruesome scene at 207 Wegman Parkway.

## II.

### A.

A wrongful death and survival action was filed by both plaintiff Paris Wilson through a guardian ad litem, his aunt Sonya Manzano, and by plaintiff D'Artagnan Manzano, individually and as Administrator of the Estates of his children DeQuan and Dartagnania.[6] The named defendants relevant to this appeal are the City of Jersey City and its 9–1–1 Operators Laura Jean Petersen and Brenda Murdaugh–Jones.[7] Plaintiffs claim that the two 9–1–1

---

[6] We deal here with the third-amended complaint filed in October 2008. In the initial complaint, filed in August 2006, D'Artagnan, the father of all three children, also served as guardian ad litem of his son Paris. The record does not reflect whether a civil action was filed on behalf of the estate of Marcia Wilson.

[7] The other named defendants were the State of New Jersey; the New Jersey State Police; Officers Santana and Vidal, and Dispatcher Clark of the Jersey City Police Department; and State Police 9–1–1 Operator Burd. The trial court found that these defendants were immune from liability based on provisions either in the 9–1–1 immunity statute, N.J.S.A. 52:17C–10, or the New Jersey Tort Claims Act, N.J.S.A. 59:1–1 to 12–3, or both. The Appellate Division affirmed the

operators were derelict in their duties and that their negligence, gross negligence, or wanton and willful disregard for the safety of others caused pain and suffering to all three children and led to the deaths of DeQuan and Dartagnania.

Plaintiffs allege, among other things, that Operator Petersen breached a duty of care by failing to identify the 9–1–1 caller's name, to determine the location from which he was calling—a single family house or apartment building—and to gather adequate information about the nature and location of the incident. They also allege that Operator Murdaugh–Jones, who received the second 9–1–1 call, failed to obtain necessary information from Andrews or to recognize that he was reporting an emergency that required an immediate police response.

Through discovery, plaintiffs presented evidence, including expert reports and deposition testimony, that the defendant 9–1–1 operators breached standard operating protocols of the Jersey City Police Department in the handling of emergency calls and that as a result of defendants' negligence or gross negligence—particularly Petersen's—the critically injured children were not discovered in time to lessen their suffering or to save the lives of DeQuan and Dartagnania.

The trial court granted summary judgment in favor of Jersey City and the 9–1–1 operators and dismissed the claims against them, finding that all three were protected by various statutory immunities. All three defendants were deemed immune under the provisions of *N.J.S.A.* 52:17C–10(e), a subsection of the general 9–1–1 immunity statute. Additionally, the court did not find sufficient evidence of wanton and willful disregard for the safety of persons or property to vault the 9–1–1 immunity statute. Last, the court determined that the Tort Claims Act provided immunity to Jersey City under *N.J.S.A.* 59:2–3(d) (immunity for discretionary activities) and *N.J.S.A.* 59:2–10 (limitation on public-entity

---

dismissal of the complaints against these defendants. *Wilson, supra,* 415 *N.J.Super.* at 168, 1 *A.*3d 723. No appeal has been taken from those rulings.

liability) and to Petersen and Murdaugh–Jones under *N.J.S.A.* 59:3–2(d) (immunity for discretionary activities).[8]

## B.

The Appellate Division reversed the grant of summary judgment dismissing the claims against the defendant 9–1–1 operators and their defendant municipal employer, finding that they were not entitled to immunity under the Tort Claims Act, *N.J.S.A.* 59:1–1 to 12–3, or the 9–1–1 immunity statute, *N.J.S.A.* 52:17C–10. *Wilson, supra,* 415 *N.J.Super.* at 156, 166, 1 *A.*3d 723. The appellate panel concluded that both Petersen and Murdaugh–Jones were expected to perform certain ministerial acts—the following of an established protocol for responding to 9–1–1 calls. *Id.* at 154, 1 *A.*3d 723. Because they were not making discretionary judgments, the panel found that their activities were not protected by the immunity provision of *N.J.S.A.* 59:3–2(d) of the Tort Claims Act.[9] *Id.* at 155–56, 1 *A.*3d 723. For the same reason, Jersey City—the employer of the 9–1–1 operators—was not exempted from liability by *N.J.S.A.* 59:2–3(d). *Id.* at 156, 1 *A.*3d 723.

Defendants also were denied immunity from liability under the 9–1–1 immunity statute. *Id.* at 166, 1 *A.*3d 723. In reaching that conclusion, the panel looked particularly at subsection (e) of *N.J.S.A.* 52:17C–10, which shields 9–1–1 operators from liability when a PSAP and its employees provide "assistance" to an "investigative or law enforcement officer." *Id.* at 157–66, 1 *A.*3d 723; *see N.J.S.A.* 52:17C–10(e). The panel construed that provi-

---

[8] The trial court also granted Jersey City's motion to dismiss plaintiffs' claim of negligent hiring, training, and supervision. The Appellate Division affirmed that ruling, and plaintiffs have not appealed from it. *Wilson, supra,* 415 *N.J.Super.* at 167–68, 1 *A.*3d 723.

[9] *N.J.S.A.* 59:3–2(d) provides that a public employee "is not liable for the exercise of discretion when, in the face of competing demands, he determines whether and how to utilize or apply existing resources, including those allocated for equipment, facilities and personnel unless a court concludes that the determination of the public employee was palpably unreasonable."

sion of the statute as protecting 9–1–1 operators who are involved in assisting police officers in an ongoing investigation. *Id.* at 163–66, 1 *A.*3d 723. From that perspective, *N.J.S.A.* 52:17C–10(e) provides immunity only to the rendering of "assistance" after a law enforcement investigation or "activity has already commenced." *Id.* at 163, 1 *A.*3d 723. According to the panel, the defendant 9–1–1 operators "were not rendering assistance to any particular officer with respect to an already existing investigatory activity," but merely "facilitating the dispatch of emergency response services," "which is a defined responsibility of a PSAP." *Id.* at 163–64, 1 *A.*3d 723. In the panel's view, no "investigation truly commenced in this case until Paris Wilson was found alive" on the morning of September 21, 2005. *Id.* at 164, 1 *A.*3d 723.

The panel attempted to harmonize subsection (e) with the other provisions of *N.J.S.A.* 52:17C–10. *Ibid.* It reasoned that to "interpret[ ] subsection (e) to grant immunity to PSAPs ... regarding calls that lead to police dispatch would entirely eliminate the need for subsections (c) and (d)" and would "ignore[ ] the common sense difference between a dispatch of emergency response services and a law enforcement investigation or other related activity." *Id.* at 164–65, 1 *A.*3d 723. Last, the panel observed that "had the Legislature intended to immunize call takers and PSAPs for the general handling of 9–1–1 calls leading to a police response, it could have simply stated in plain language that neither would be liable for damages resulting from the handling of emergency calls." [10] *Id.* at 165, 1 *A.*3d 723.

We granted the petitions for certification of both Jersey City and 9–1–1 Operators Petersen and Murdaugh–Jones. *Wilson ex rel. Manzano v. City of Jersey City,* 205 *N.J.* 80 (2010).

---

[10] Plaintiffs appealed the trial court's finding that there was insufficient evidence of wanton and willful disregard for the safety of persons or property to vault the 9–1–1 immunity statute. Perhaps because the negligence claims were reinstated, the Appellate Division never addressed that issue.

III.

A.

Based on the summary-judgment record—viewing the evidence in the light most favorable to plaintiffs—we accept that there is sufficient evidence to support a finding of negligence against defendant 9–1–1 operators and Jersey City. The facts underlying this case involve a profound tragedy. However, our focus in this appeal is on the meaning of a statute. The primary issue before us is whether the 9–1–1 statute shields defendants from civil liability.

Our paramount goal in interpreting a statute is to give effect to the Legislature's intent. *State v. Maguire,* 84 *N.J.* 508, 514, 423 *A.2d* 294 (1980). When that intent is revealed by a statute's plain language—ascribing to the words used "their ordinary meaning and significance"—we need look no further. *Di-Prospero v. Penn,* 183 *N.J.* 477, 492, 874 *A.2d* 1039 (2005). However, not every statute is a model of clarity. When the statutory language is sufficiently ambiguous that it may be susceptible to more than one plausible interpretation, we may turn to such extrinsic guides as legislative history, including sponsor statements and committee reports. *Burns v. Belafsky,* 166 *N.J.* 466, 473, 766 *A.2d* 1095 (2001). We may also turn to extrinsic guides if a literal reading of the statute would yield an absurd result, particularly one at odds with the overall statutory scheme. *See Burnett v. Cnty. of Bergen,* 198 *N.J.* 408, 424–25, 968 *A.2d* 1151 (2009); *State v. Provenzano,* 34 *N.J.* 318, 322, 169 *A.2d* 135 (1961). An enactment that is part of a larger statutory framework should not be read in isolation, but in relation to other constituent parts so that a sensible meaning may be given to the whole of the legislative scheme. *Kimmelman v. Henkels & McCoy, Inc.,* 108 *N.J.* 123, 129, 527 *A.2d* 1368 (1987). We also must be guided by the legislative objectives sought to be achieved by enacting the statute. *LaFage v. Jani,* 166 *N.J.* 412, 431, 766 *A.2d* 1066 (2001).

These canons of statutory interpretation are particularly important in unraveling the meaning of the statute before us.

### B.

The Appellate Division opinion has determined that PSAPs and 9-1-1 operators are not entitled to immunity under *N.J.S.A.* 52:17C–10 for careless mistakes made when dispatching police, fire, or first-aid personnel to the scene of an emergency, but that PSAPs and 9-1-1 operators are immune for such mistakes when assisting the police in an ongoing investigation. *Wilson, supra,* 415 *N.J.Super.* at 163–66, 1 *A.*3d 723. Such an interpretation produces several odd results. First, the general purpose served by PSAPs and 9-1-1 operators is to respond to distress calls—emergencies that require immediate attention—and to divert other calls for handling in the ordinary course. *See id.* at 166, 1 *A.*3d 723; *see also N.J.S.A.* 52:17C–1($l$). The Appellate Division has construed the statute to strip 9-1-1 operators of immunity for mistakes made while fulfilling their primary function while cloaking them with immunity for a subsidiary purpose—assisting an ongoing police investigation. *Wilson, supra,* 415 *N.J.Super.* at 166, 1 *A.*3d 723. Second, under the prior version of *N.J.S.A.* 52:17C–10, PSAPs and 9-1-1 operators as well as telecommunications companies had immunity from liability for acts or omissions causing injury to the caller. *See N.J.S.A.* 52:17C–10(b) (repealed by *L.* 1999, *c.* 125, § 5). Accordingly, 9-1-1 operators were not liable for their negligence in dispatching or failing to dispatch police, fire, or first-aid personnel. The Appellate Division has interpreted the amended statute to provide greater immunity to telecommunications companies—immunity from civil damages caused to any person not just the caller, *see N.J.S.A.* 52:17C–10(d)—and to withdraw virtually all immunity to the PSAPs and 9-1-1 operators. *See Wilson, supra,* 415 *N.J.Super.* at 166, 1 *A.*3d 723. Nothing in the legislative history suggests that the Legislature intended such a result. Moreover, interpreting the statute in this manner leaves a legislative scheme in which police

officers, firefighters, and paramedics responding to an emergency are immunized for their negligent acts whereas the 9–1–1 operators handling the emergency call are subject to suit. *See N.J.S.A.* 2A:62A–1.1; *N.J.S.A.* 2A:62A–1.2; *N.J.S.A.* 2A:62A–1.

The wording of *N.J.S.A.* 52:17C–10 is far from crystal clear. However, ambiguities in language should not be read to achieve a result that the Legislature evidently did not intend. *See Maguire, supra,* 84 *N.J.* at 514, 423 *A.2d* 294. Furthermore, the statutory language does not require us to read *N.J.S.A.* 52:17C–10 to reach an absurd result. *See Burnett, supra,* 198 *N.J.* at 425, 968 *A.2d* 1151. For these reasons, we believe the appellate panels here and in *Massachi* have misread *N.J.S.A.* 52:17C–10 and the Legislature's intent. We conclude that the language of *N.J.S.A.* 52:17C–10, its legislative history, and the overall objectives of the statute indicate that PSAPs and 9–1–1 operators are afforded immunity for negligence in handling 9–1–1 calls.

We start at the beginning, tracing the lineage of the emergency response number, 9–1–1, and the immunity provisions found in *N.J.S.A.* 52:17C–10.

## IV.

### A.

The development and implementation of a single universal telephone number for the reporting of emergencies requiring a police, fire, or first-aid response was originally recommended in a report issued in 1967 by the President's Commission on Law Enforcement and Justice. Emergency Response System Study Comm'n, *First Phase Report* 4 (Dec. 30, 1986). In New Jersey, the first 9–1–1 emergency telephone service was initiated in Atlantic City in 1970, and over time such systems became operational in all twenty-one counties. *Ibid.*

A 9–1–1 emergency system, generally, requires collaboration between private telecommunications companies and governmental agencies operating public safety answering points (PSAPs). *See*

Peter P. Ten Eyck, *Dial 911 and Report a Congressional Empty Promise: The Wireless Communications and Public Safety Act of 1999,* 54 *Fed. Comm. L.J.* 53, 56–57 (2001). The telecommunications companies provide the equipment that allows the relay of emergency calls to geographically appropriate PSAPs. *Ibid.* In turn, the PSAPs, manned by specially trained operators, gather information from the caller, and convey the necessary details to the appropriate police, fire, or first-aid emergency personnel. *Ibid.; see also N.J.S.A.* 52:17C–1(*l* ).

Because the effective delivery of 9–1–1 services on a statewide basis called for the cooperation of telecommunications companies and government at all levels, and the expenditure of public funds, in 1986, Governor Thomas Kean approved a law establishing the Emergency Response System Study Commission. *See* Assembly Bill No. 4225 of 1985 (*L.* 1985, *c.* 542); *First Phase Report, supra,* at 1. The Commission was charged with crafting legislation "to create a Statewide enhanced 9–1–1 emergency telephone system" and with remedying defects in the then-existing "emergency response system in the State." *First Phase Report, supra,* at 1. Testimony at public hearings established that a statewide enhanced 9–1–1 system would save lives and property by reducing the response time to emergencies. *Id.* at 15.

As a result of the Commission's work, in 1989, the Legislature enacted a comprehensive legislative scheme establishing a statewide enhanced 9–1–1 system. *See L.* 1989, *c.* 3 (codified as amended at *N.J.S.A.* 52:17C–1 to –20); *see also L.* 1989, *c.* 2, § 1 (codified as amended at *N.J.S.A.* 54:32B–8.13). The new legislation involved a public and private partnership between telecommunications companies and various government agencies. The enhanced 9–1–1 Act mandated that each telephone company in this State provide a system of enhanced 9–1–1 service within three years, *L.* 1989, *c.* 3, § 4 (codified as amended at *N.J.S.A.* 52:17C–4), that each county appoint a 9–1–1 coordinator, *L.* 1989, *c.* 3, § 5 (codified at *N.J.S.A.* 52:17C–5), and that each municipality participate in providing a PSAP service, *L.* 1989, *c.* 3, § 6 (codified at

*N.J.S.A.* 52:17C–6). The State imposed a tax on the sale of telecommunications equipment to assist in funding the enhanced 9–1–1 system. *See L.* 1989, c. 2, § 1 (codified as amended at *N.J.S.A.* 54:32B–8.13).

Under the statutory scheme, counties and municipalities established PSAPs responsible for "dispatching or forwarding requests for law enforcement, fire fighting, emergency medical services, or other emergency services to a public or private safety agency." *N.J.S.A.* 52:17C–8. As of 2006, New Jersey had more than 200 PSAPs, which were primarily funded and managed at the local level with some support from their respective counties. John J. Heldrich Ctr. for Workforce Dev., Rutgers, the State Univ. of N.J., *Saving Lives, Increasing Value: Opportunities and Strategies for Consolidating New Jersey's 9–1–1 Emergency Services* 7 (Oct.2006) (report prepared for Office of Emergency Telecommunications Services). The public entities in charge of the PSAPs are also responsible for the costs of both maintaining the necessary equipment and providing operational services of PSAPs. *Ibid.* Most PSAPs are operated by local or county law enforcement agencies. *Id.* at 8.

The enhanced 9–1–1 statute also enacted the Commission's recommendation to grant extensive immunity to, among others, telecommunications companies and PSAPs in providing emergency communication services. *N.J.S.A.* 52:17C–10(b) stated:

> No telephone company, public safety answering point, agents of, or manufacturer supplying equipment to a telephone company or PSAP, shall be liable *to any person who uses* the enhanced 9–1–1 service established under this act for release of the information specified in this section, including non-published telephone numbers, or for failure of any equipment or procedure in connection with the enhanced 9–1–1 service or *for any act or omission of any act committed while in the training for or in rendering PSAP services in good faith and in accordance with this act.*
>
> [*L.* 1989, *c.* 3, § 10 (codified as amended at *N.J.S.A.* 52:17C–10(b) (repealed by *L.* 1999, *c.* 125, § 5)) (emphasis added).]

Although there is virtually no discussion in the Commission's report, or the legislative history, explaining the reasons for this grant of immunity, it probably was a trade-off for directing these

private and public entities to engage in an enterprise that would expose them to potentially vast liability.

The Act's broad-ranging immunity protected telecommunications companies and PSAPs from potential liability actions brought by the users of enhanced 9–1–1 service in three areas: (1) the release of personal information, including non-published telephone numbers; (2) equipment or procedure failures "in connection with enhanced 9–1–1 service"; and (3) acts or omissions "in rendering PSAP services in good faith and in accordance with this act." *Ibid.* The immunity provision of subsection (b) clearly immunized 9–1–1 operators for any negligence "in rendering PSAP services" to users of the 9–1–1 systems. Those services necessarily included handling emergency calls for police, fire, or first-aid—the primary task of a 9–1–1 operator. Subsection (b) limited liability "to any person who uses the enhanced 9–1–1 service," such as callers. *Ibid.* Thus, a telephone company or 9–1–1 operator did not have immunity for acts or omissions causing injury or damages to a non-user of the 9–1–1 system.

In 1999, the Legislature amended the enhanced 9–1–1 Act, eliminating the (b) immunity provision and replacing it with a three-part immunity scheme now contained in *N.J.S.A.* 52:17C–10(c), (d), and (e). *L.* 1999, *c.* 125, § 5 (codified as amended at *N.J.S.A.* 52:17C–10). The primary issue is whether the Legislature in amending the Act intended to remove almost all immunity earlier provided to 9–1–1 operators and PSAPs in their handling of emergency calls.

### B.

The 1989 enhanced 9–1–1 legislation did not anticipate the rapid growth of cellular telephone use, and few wireless providers utilized the enhanced 9–1–1 technology. *See* Ten Eyck, *supra,* 54 *Fed. Comm. L.J.* at 57. The burgeoning use of cellular telephones raised a national concern about the effectiveness of 9–1–1 systems across the country. *Ibid.* In response, Congress passed the Wireless Communications and Public Safety Act of 1999 to "en-

courage and facilitate the prompt deployment throughout the United States of a seamless, ubiquitous, and reliable end-to-end infrastructure for communications ... to meet the Nation's public safety and other communications needs." Pub.L. No. 106–81, § 2(b), 113 Stat. 1286, 1287 (codified as amended at 47 *U.S.C.A.* § 615). The Act, among other things, established a universal emergency telephone number (9–1–1), 47 *U.S.C.A.* § 251(e)(3), and guaranteed that wireless carriers would receive the same immunity from liability provided to non-wireless carriers under state laws, 47 *U.S.C.A.* § 615a.

To correspond with the dictates of an impending federal law, 47 *U.S.C.A.* § 615a, in 1999, our Legislature amended its enhanced 9–1–1 Act to confer the same immunity to wireless telecommunications providers that already was provided to telephone companies. *See L.* 1999, c. 125, § 5 (codified as amended at *N.J.S.A.* 52:17C–10). The 1999 amendments not only added wireless telephone companies to the list of parties receiving immunity protection, but also altered the structure and language of the 9–1–1 immunity provision. *See N.J.S.A.* 52:17C–10(c), (d), and (e). The amended statute clearly expanded immunity to telecommunications carriers. The issue is whether, in amending that statute, the Legislature intended to contract or eliminate immunity to governmental agencies operating PSAPs. To address that issue, we next turn to the language of the amendments to *N.J.S.A.* 52:17C–10.

### C.

The amended *N.J.S.A.* 52:17C–10 deleted subsection (b) and, in its place, added subsections (c), (d), and (e):

b. (Deleted by amendment, P.L.1999, c. 125).

c. No telephone company, person providing commercial mobile radio service as defined in 47 U.S.C.s. 332(d), public safety answering point, or manufacturer supplying equipment to a telephone company, wireless telephone company, or PSAP, or any employee, director, officer, or agent of any such entity, shall be liable for damages to any person who uses or attempts to use the enhanced 9–1–1 service, wireless 9–1–1 service or wireless enhanced 9–1–1 service established under this act for release of the information specified in this section, including non-published telephone numbers. This limitation of liability is inapplicable if such failure

resulted from a malicious purpose or a wanton and willful disregard for the safety of persons or property.

d. No telephone company, person providing commercial mobile radio service as defined in 47 U.S.C.s. 332(d), public safety answering point, or manufacturer supplying equipment to a telephone company, wireless telephone company, or PSAP, or any employee, director, officer, or agent of any such entity, shall be liable to any person for civil damages, or subject to criminal prosecution resulting from or caused by any act, failure or omission in the development, design, installation, operation, maintenance, performance or provisioning of any hardware, software, or any other aspect of delivering enhanced 9–1–1 service, wireless 9–1–1 service or wireless enhanced 9–1–1 service. This limitation of liability is inapplicable if such failure resulted from a malicious purpose or a wanton and willful disregard for the safety of persons or property.

e. No telephone company, person providing commercial mobile radio service as defined in 47 U.S.C.s. 332(d), public safety answering point, or manufacturer supplying equipment to a telephone company, wireless telephone company, or PSAP, or any employee, director, officer, or agent of any such entity, shall be liable to any person for damages resulting from or in connection with such entity's provision of any lawful assistance to any investigative or law enforcement officer of this State or a political subdivision of this State, of the United States, or of any other state or a political subdivision of such state in connection with any lawful investigation by or other law enforcement activity of the law enforcement officer unless the entity, in providing such assistance, acted in a manner exhibiting wanton and willful disregard for the safety of persons or property.

[*N.J.S.A.* 52:17C–10.] [11]

The language of the new subsections (c), (d), and (e) of *N.J.S.A.* 52:17C–10 appear not only to replicate, but expand on the immunity provided to telecommunications companies, PSAPs, and their employees, under the old subsection (b). As in the now deleted subsection (b), subsection (c) confers immunity on telecommunications companies and PSAPs for the release of personal information, including unpublished telephone numbers. Although the

---

[11] Subsection (a) of *N.J.S.A.* 52:17C–10 remained unaltered in the amended law. That part of the statute provides:

Whenever possible and practicable, telephone companies shall forward to jurisdictional public safety answering points via enhanced 9–1–1 network features, the telephone number and street address of any telephone used to place a 9–1–1 call. Subscriber information provided in accordance with this section shall be used only for the purpose of responding to emergency calls or for the investigation of false or intentionally misleading reports of incidents requiring emergency service.

[*N.J.S.A.* 52:17C–10(a).]

Appellate Division believes that subsection (d) provides immunity only for equipment failure, our view is that (d) covers other failures as well, such as errors made by a 9–1–1 operator in dispatching police, fire, and first-aid. Subsection (e) provides immunity for mistakes made in assisting an ongoing police investigation.

The changes in this new statutory scheme all point toward increased protection from liability for telecommunications companies and public entities. Thus, in addition to providing civil immunity, (d) provides protection from criminal liability for certain acts or omissions made by these entities and their personnel. Unlike the 1989 Act, which provided immunity only for acts or omissions causing harm to a *user* of enhanced 9–1–1 services, the amended Act extends immunity to acts or omissions causing civil damages to "any person" under the circumstances set forth in (d) and (e). The amended Act also contains a heightened threshold for vaulting the immunity provision. Telecommunications carriers and PSAPs, and their employees, were immune for acts or omissions made in "good faith" under the 1989 Act. Now they are clothed with immunity unless their failures "result[ ] from a malicious purpose or a wanton and willful disregard for the safety of persons or property." *N.J.S.A.* 52:17C–10(c) and (d). These alterations evidence, in addition to giving parity to wireless carriers, a legislative design to expand, not contract, the immunity extended to telecommunications carriers and PSAPs.

Moreover, nothing in the legislative history suggests that the Legislature intended to withdraw or contract the immunity previously granted to governmental agencies and their employees operating PSAPs. Several pieces of legislative history inform our discussion: (1) the Senate Sponsors' statement, (2) the Assembly Policy and Regulatory Oversight Committee's statement, and (3) the Senate Law and Public Safety Committee's statement.

The Senate Sponsors' statement appended to the amendments that became (c), (d), and (e) of *N.J.S.A.* 52:17C–10 indicated that the new provisions were intended to "*expand* [ ] limitation of

liability for telephone companies, wireless telephone companies *and other entities* in connection with enhanced 9–1–1 service or wireless enhanced 9–1–1 service and in connection with supplying assistance to investigative or law enforcement officers." Sponsors' Statement, *Statement to Senate Bill No. 1495* (Nov. 16, 1998) (emphasis added).

A statement issued by the Assembly Policy and Regulatory Oversight Committee noted that the new law "alters the existing limitation of liability language to include wireless enhanced 9–1–1 service, except in the event of wanton or willful disregard for the safety of persons or property." Assemb. Policy & Regulatory Oversight Comm., *Statement to Senate Bill No. 1495* (Mar. 18, 1999); *see also* Assemb. Appropriations Comm., *Statement to Senate Bill No. 1495* (May 3, 1999) (using identical language to describe amended immunity provisions).

Last, the Senate Law and Public Safety Committee described the amendments as (1) "clarify[ing] existing limitations of liability for telephone companies, wireless telephone companies and other entities in connection with enhanced 9–1–1 service and wireless enhanced 9–1–1 service and in connection with supplying assistance to investigative or law enforcement officers"; (2) "alter[ing] the limitation of liability language to include wireless 9–1–1 service"; and (3) making immunity "inapplicable in the event of wanton or willful disregard for the safety of persons or property." S. Law & Pub. Safety Comm., *Statement to Senate Bill No. 1495* (Jan. 25, 1999).

The views expressed in the various legislative statements show that the intent was to give wireless carriers the same protections as their telecommunications counterparts and to expand immunity. That the amendments clarified and altered the immunity provisions is completely consistent with the goal of expanding immunity—a goal expressed in the legislation itself.

D.

In the case before us, the parties primarily battle over the meaning of *N.J.S.A.* 52:17C–10(e). Defendants take an expansive

view of subsection (e), arguing that 9–1–1 operators are immune from liability for their negligent acts or omissions in assisting the dispatch of law enforcement officers to the scene of an emergency. On the other hand, plaintiffs contend that 9–1–1 operators are only immune for their negligence in assisting an ongoing investigation. Because plaintiffs submit that the 9–1–1 operators in this case were addressing an emergency and not a preexisting police investigation, they claim that the immunity provision of subsection (e) does not apply.

Too narrowly focusing on only *N.J.S.A.* 52:17C–10(e) elides the larger question of whether *N.J.S.A.* 52:17C–10(d) provides 9–1–1 operators immunity, in general, for their negligence in dispatching police, fire, and paramedics to the scene of an emergency. If 9–1–1 operators do have immunity for acts and omissions in dispatching first-responders to the scenes of emergencies under *N.J.S.A.* 52:17C–10(d), then that necessarily requires that we harmonize *N.J.S.A.* 52:17C–10(e) with subsection (d).

Under the now deleted *N.J.S.A.* 52:17C–10(b), 9–1–1 operators were immune for negligent acts causing injury to a *caller* who sought assistance for police, fire, or first-aid. The panels in *Massachi* and *Wilson* concluded that in the amendments to *N.J.S.A.* 52:17C–10, the Legislature retrenched its grant of immunity to 9–1–1 operators even while expanding immunity to telecommunications carriers. In the Appellate Division's view, immunity protection is no longer provided for lawsuits brought by a caller (or "any person" under the current statute) with regard to errors made by a 9–1–1 operator dispatching first-responders to the scene of an emergency. The only remaining dispatch immunity for 9–1–1 operators relates to assisting police in an ongoing investigation (even if non-emergent).

Because we believe that this result does not logically follow from the language of *N.J.S.A.* 52:17C–10(c), (d), and (e), and is wholly discordant with the legislative objectives and history of the statute, we must examine how *Massachi* arrived at a contrary conclusion.

### E.

In *Massachi, supra,* the Appellate Division held that *N.J.S.A.* 52:17C–10 did not afford immunity to the defendant City of Newark whose 9–1–1 operator negligently handled a call for emergency assistance. 415 *N.J.Super.* at 522, 2 *A.*3d 1117. In that case, the negligent "rendering of 9–1–1 services[ ] includ[ed] dispatching police to an incorrect location, failing to keep the caller on the line so [the caller] could update the [operator] on the location of the perpetrator and failing to broadcast an alert to surrounding municipalities." [12] *Ibid.*

The Appellate Division concluded that subsection (d) of *N.J.S.A.* 52:17C–10, "does not provide immunity from the consequences of a [9–1–1 operator's] negligence in responding to a request for emergency services," such as the negligent inputting of information received from a caller and the negligent dispatch of police units in response to a call. *Id.* at 550, 2 *A.*3d 1117. It also concluded that subsection (e) provides a 9–1–1 operator immunity only when handling a call with regard to an ongoing police investigation. *Id.* at 549, 2 *A.*3d 1117. Thus, because in *Massachi* the police had not requested assistance, the 9–1–1 operator's negligence did not fit within the subsection (e) immunity provision that is triggered by "assistance to law enforcement . . . in connection with any lawful investigation by or other law enforcement activity of the law enforcement officer." *Id.* at 550, 2 *A.*3d 1117 (quoting *N.J.S.A.* 52:17C–10(e)).

Under *Massachi's* reading of *N.J.S.A.* 52:17C–10, 9–1–1 operators who mishandle calls dispatching police, fire, and first-aid personnel to the scene of an emergency have no immunity, but

---

[12] In *Massachi,* a 9–1–1 operator and a police dispatcher made various errors in handling a call reporting a kidnapping. *Id.* at 523–24, 2 *A.*3d 1117. Those errors caused a delayed police response to an ongoing crime. *Ibid.* By the time the police finally arrived at the kidnapper's home, the victim was mortally wounded. *Id.* at 524, 2 *A.*3d 1117. A lawsuit was brought against the City as a result of the allegedly "negligent mishandling of the call, and failure to properly dispatch police." *Id.* at 522, 2 *A.*3d 1117.

those same operators mishandling a call concerning an ongoing police investigation do have immunity. This seemingly absurd result—so at odds with the previous version of *N.J.S.A.* 52:17C–10—is reached because the *Massachi* panel concluded that subsection (d) only provides immunity for equipment failure. So we must look carefully at how *Massachi* parsed the language of subsection (d). The relevant portion of this subsection provides:

> No telephone company [or] ... public safety answering point ... or any employee ... of any such entity, shall be liable to any person for civil damages ... resulting from or caused by any act, failure or omission in the development, design, installation, operation, maintenance, performance or provisioning of any hardware, software, *or any other aspect of delivering enhanced 9–1–1 service, wireless 9–1–1 service or wireless enhanced 9–1–1 service.*
>
> [*N.J.S.A.* 52:17C–10(d) (emphasis added).]

■ The key issue is whether the language "any other aspect of delivering enhanced 9–1–1 service" is limited to the preceding categories addressing equipment—hardware and software—or whether the language is sufficiently expansive that it covers mishandling of emergency calls by 9–1–1 operators. The *Massachi* court invoked the doctrine of *ejusdem generis* to narrowly construe the reach of immunity in subsection (d). Under that canon of statutory construction, "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Id.* at 543–44, 2 *A.*3d 1117 (internal quotation marks omitted). Thus, by the *Massachi* court's account, "'any other aspect of delivering enhanced 9–1–1 service' in subsection (d) should be interpreted in like fashion as the words that immediately precede it, which are 'development, design, installation, operation, maintenance, performance or provisioning of any hardware[ ] [or] software.'" *Id.* at 544, 2 *A.*3d 1117 (quoting *N.J.S.A.* 52:17C–10(d)) (alterations in original).

■ However, *ejusdem generis* is just one of many aids in construing a statute and, if misapplied, may subvert, rather than advance the Legislature's intent. The counter canon to *ejusdem*

*generis* is that "more general words can indicate a statutory purpose to broaden the scope of the statute." Einer Elhauge, *Preference–Eliciting Statutory Default,* 102 *Colum. L.Rev.* 2162, 2216 (2002); *see also* Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutory Construction* § 47:22 at 394–98 (7th ed.2007). Thus, we are warned that *ejusdem generis* "may not be used to defeat the obvious purpose of legislation." *Gooch v. United States,* 297 *U.S.* 124, 128, 56 *S.Ct.* 395, 397, 80 *L.Ed.* 522, 526 (1936); *see also Texas v. United States,* 292 *U.S.* 522, 534, 54 *S.Ct.* 819, 825, 78 *L.Ed.* 1402, 1411 (1934) ("The rule of *'ejusdem generis'* is applied as an aid in ascertaining the intention of the legislature, not to subvert it when ascertained.").

The *Massachi* court gave a constricted definition to the term "delivery." *See Massachi, supra,* 415 *N.J.Super.* at 539–43, 2 *A.*3d 1117 (choosing to define term as "to send . . . to an intended . . . destination" rather than "to produce the promised, desired or expected results"). However, construing the phrase "any other aspect of delivering enhanced 9–1–1 service" as a catchall, broadly providing immunity for 9–1–1 operators from liability lawsuits, not only makes the statute internally consistent but also faithful to its prior version and to the evident intent of the Legislature in broadening immunity in the most recent round of amendments. The phrase "delivering enhanced 9–1–1 service" certainly can embrace the acts of 9–1–1 operators receiving emergency calls and dispatching police, fire, and first-aid in response to those calls. As with many statutes, words on their face are not abundantly clear. But words, which standing alone may be ambiguous, take on meaning when considered within their surroundings and by the overall sense of the legislation. We can understand how the Appellate Division was led astray. This is not an easy statute to read.

However, construing the terms at issue as the Appellate Division has done yields absurd results. The careless design and implementation of 9–1–1 software and hardware, even the insertion of a plug in the wrong socket to turn on the system, receives

the shield of immunity but the 9–1–1 operator who is working under the high stress of receiving a frantic call and who must act decisively in a matter of seconds does not. The Appellate Division never explained why the Legislature would provide expansive protection to telecommunications companies and leave municipalities subject to costly lawsuits when both were compelled to participate in the same enhanced 9–1–1 system. Nor did it explain why the Legislature, which previously had given 9–1–1 operators immunity for mishandling calls from users of the 9–1–1 system, would withdraw that immunity to public entities while expanding the protections to telecommunications companies who cause civil damages to any person as a result of their negligent acts. Nor did it explain why the Legislature would immunize 9–1–1 operators when they assist police in an ongoing investigation but not when they carry out their primary function of receiving emergency calls that require the immediate dispatch of police, fire, and first-aid personnel.

Moreover, the Appellate Division's approach in *Massachi* and in this case cannot be harmonized with the broad-based statutory immunities provided to police, fire, and first-aid personnel who respond to emergencies. Law enforcement officers and firefighters are "not liable for any civil damages as a result of any acts or omissions undertaken in good faith in rendering care at the scene of an accident or emergency to any victim." *N.J.S.A.* 2A:62A–1.1 (immunizing municipal, county, and state law enforcement officers); *N.J.S.A.* 2A:62A–1.2 (immunizing paid and volunteer municipal, county, and state firefighters). Likewise, a person licensed to treat an injury, e.g., a nurse or doctor, or a member of a volunteer emergency or first-aid squad, acting in "good faith," is not "liable for any civil damages as a result of any acts or omissions" in rendering "emergency care at the scene of an accident or emergency." *N.J.S.A.* 2A:62A–1.

■ Reading *N.J.S.A.* 52:17C–10 together as a whole, giving meaning to each of its parts, harmonizing it with surrounding statutes, and making it faithful to its predecessor version leads to

interpreting subsection (d) as providing immunity to 9–1–1 operators for acts or omissions in the handling of emergent calls—the primary function of the 9–1–1 system—and to interpreting subsection (e) as providing immunity to 9–1–1 operators for acts or omissions in rendering assistance to ongoing law enforcement investigations and activities—a less traditional function of the 9–1–1 system. We must remember, as well, that the immunity provision of both subsections (d) and (e) are inapplicable if a 9–1–1 operator acts in "wanton and willful disregard for the safety of persons or property." *N.J.S.A.* 52:17C–10.

Many states provide immunity to 9–1–1 operators in clearly written statutes consistent with our reading of *N.J.S.A.* 52:17C–10. *See, e.g., Mo.Rev.Stat.* § 190.307(1) (2011) ("No public agency or public safety agency, nor any officer, agent or employee of any public agency, shall be liable for any civil damages as a result of any act or omission except willful and wanton misconduct or gross negligence, in connection with developing, adopting, operating or implementing any plan or system required by [9–1–1 statutes]."); *Nev.Rev.Stat.* § 707.500(1)(c) (2011) (immunizing 9–1–1 service providers and PSAPs from suit resulting from "[a]ny act, or the omission of any act, committed in good faith"); *S.D. Codified Laws* § 34–45–17 (2011) ("In ... the provisioning of the 911 service, except for willful or wanton negligence or intentional acts, the board, the governing body, public agency, service provider, and service supplier, their employees and agents, are immune from liability for a failure in the use or operation of the 911 system.").[13]

Many other states have enacted broadly written statutes—some infused with ambiguity—that seemingly provide immunity to individuals and entities involved in the 9–1–1 system.[14] Courts—when

---

[13] *See also W. Va.Code Ann.* § 24–6–8 (LexisNexis 2011) (granting 9–1–1 operators immunity from suit "arising from any act or omission, except willful or wanton misconduct").

[14] *See, e.g., Alaska Stat.* § 29.35.133(a) (2011); *Ark.Code. Ann.* § 12–10–317(a)(3) (2011); 50 *Ill. Comp. Stat. Ann.* 750/15.1 (LexisNexis 2011); *Ind.Code*

given the opportunity to construe some of those statutes—have read them as providing immunity to 9–1–1 operators who mishandle emergency calls. *See, e.g., Harrell v. City of Chicago Heights,* 945 *F.Supp.* 1112, 1116–18 (N.D.Ill.1996) (finding that under state 9–1–1 immunity statute, city and employees are not liable "for the failure expeditiously to dispatch rescue vehicles to the [victim's] residence," absent willful misconduct); *Giles v. Brown Cnty.,* 868 *N.E.*2d 478, 480–82 (Ind.2007) (applying 9–1–1 immunity statute when county operator dispatched ambulance that did not arrive in time to save heart attack victim); *Lewis v. Four Corners Volunteer Fire Dep't,* 994 *So.*2d 696, 699, 701 (La.Ct.App.2008) (recognizing that 9–1–1 call center was statutorily immune from suit for operator's alleged mishandling of call for emergency fire aid).

We thus hold that the 9–1–1 operators, and their employer the City of Jersey City, are immune for any negligent mishandling of the emergency calls in this case under subsection (d) of *N.J.S.A.* 52:17C–10. This result is commanded by our understanding of the statute's language and history and the objectives that the Legislature intended to achieve.

The Legislature, it appears, did not conscript municipalities and other public and private entities into providing and operating an enhanced 9–1–1 system without according them some measure of immunity for acts and omissions that do not rise to "wanton and willful disregard for the safety of persons or property." *N.J.S.A.* 52:17C–10. An enhanced 9–1–1 system—developed and operated by telecommunications companies and public entities—that allows

---

Ann. § 34–13–3–3(19) (LexisNexis 2011); Kan. Stat. Ann. § 12–5308 (2011); La.Rev.Stat. § 33:9108(B) (2012); Minn.Stat. § 403.07 (2010); Ohio Rev.Code Ann. § 4931.49 (LexisNexis 2011); R.I. Gen. Laws § 39–21.1–1(b)(10) (2011); S.C.Code Ann. § 23–47–70(A) (2010); Tex. Health & Safety Code Ann. § 771.053(a) (Vernon 2011); Vt. Stat. Ann. tit. 30, § 7060 (2011). But see Ky.Rev.Stat. Ann. § 65.7637 (LexisNexis 2011) (permitting suits for "negligence, or wanton or willful misconduct, or bad faith"); Neb.Rev.Stat. § 86–441 (2011) (immunizing 9–1–1 providers except when failure to use "reasonable care or for intentional acts").

for a rapid response by police, fire, and first-aid personnel to emergencies is of incalculable benefit to society and saves lives. *See* Office of the Governor, *Press Release for A–135 and A–1576* (Jan. 19, 1989); *First Phase Report, supra,* at 15. But as with every system that depends on human endeavor and decision-making, errors will occur.

The tragic events underlying the lawsuit in this case naturally evoke sympathy. However, the Legislature has decided that the overall benefits to our State from an enhanced 9–1–1 system require shielding telecommunications and public entities, and their personnel, from potentially costly lawsuits for mistakes, even negligent ones. The Legislature has chosen the means to achieve its policy goals in bringing a statewide enhanced 9–1–1 system into operation. Our role is complete once we have made clear the meaning of the law enacted by the Legislature.

## V.

For the reasons expressed, we reverse the judgment of the Appellate Division. Defendant 9–1–1 Operators Petersen and Murdaugh–Jones and defendant Jersey City are immune for any negligence causing civil damages to plaintiffs. *See N.J.S.A.* 52:17C–10(d). Because the panel never addressed plaintiffs' argument that the trial court erred in finding insufficient evidence of wanton and willful disregard for the safety of persons—a claim not extinguished by the immunity statute—we remand to the Appellate Division for determination of that issue. In light of this disposition under the 9–1–1 immunity statute, there is no need to address the Appellate Division's analysis and rulings under the Tort Claims Act, *N.J.S.A.* 59:1–1 to 12–3.

*For reversal and remandment*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS, PATTERSON and Judge WEFING (temporarily assigned)—6.