**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3008-23

LOBNA ELBERRI,

     Plaintiff-Appellant,

v.

CROSSPOINTE CONDO
ASSOCIATION, JOSEPH
GENCHIK, DHELMA SALAZAR,
TANIA SALAZAR, and
KUAN HSIUNG CHOU,

     Defendants-Respondents,

and

JACOBSON GOLDFARB SCOTT
INSURANCE and ALLSTATE
INSURANCE COMPANY,

     Defendants.

_____

Submitted September 10, 2025 – Decided October 2, 2025

Before Judges Gooden Brown and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-7205-20.

Lobna Elberri, appellant pro se.

Hill Wallack, LLP, attorneys for respondent Crosspointe Condominium Association (Michael S. Karpoff, on the brief).

Hoagland, Longo, Moran, Dunst & Doukas, LLP, attorneys for respondent Joseph Genchik (Juliann M. Alicino, of counsel and on the brief; Kristin M. Gummoe, on the brief).

O'Toole, Couch & Della Rovere, LLC, attorneys for respondents Dhelma Salazar and Tania Salazar (Michael Della Rovere, on the brief).

Venema, Proko & Keahey, attorneys for respondent Kuan Hsiung Chou (George B. Keahey, on the brief).

PER CURIAM

This dispute arises from flooding incidents that occurred at the Crosspointe Condominium located in East Brunswick. Plaintiff Lobna Elberri's ground-floor unit was damaged as a result of the flooding and was deemed uninhabitable. Plaintiff sued Crosspointe Condominium Association (Association) as well as three insurance entities[1] and four individual unit owners whose units allegedly caused the flooding. The individual defendants are Dhelma Salazar, Tania Salazar, Kuan Hsiung Chou, and Joseph Genchik. After

---

[1] The insurance companies were subsequently dismissed from the case by stipulation or court order.

2                                                          A-3008-23

extensive motion practice, the trial court ultimately granted summary judgment in favor of the Association and the individual defendants and denied reconsideration, effectively dismissing plaintiff's complaint with prejudice. The court also granted partial summary judgment on the Association's counterclaim, which sought a court order to enforce its right to inspect plaintiff's unit and make necessary repairs.

Despite listing several orders in her amended notice of appeal, other than challenging the February 3, 2023 order granting the Association's motion for summary judgment on its counterclaim, plaintiff, who is self-represented, makes no argument to support any other claim. Accordingly, we deem those claims waived and only address the February 3 order granting summary judgment to the Association, which we affirm. See Pressler and Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2026) ("[A]n issue not briefed is deemed waived."); see also N.J. Dep't of Env't Prot. v. Alloway Twp., 438 N.J. Super. 501, 505 n.2 (App. Div. 2015) ("An issue that is not briefed is deemed waived upon appeal."); Telebright Corp. v. Dir., N.J. Div. of Tax'n, 424 N.J. Super. 384, 393 (App. Div. 2012) (deeming contention waived when party failed to include arguments supporting contention in its brief other than "one sentence in the conclusion section").

A-3008-23

The following facts are germane to the issues properly before us on appeal. Plaintiff purchased a ground-floor unit at Crosspointe Condominium in December 2018. Plaintiff's unit is located in a condominium building consisting of three floors. As a unit owner, plaintiff was subject to the governing master deed (Master Deed) and bylaws of the Association (Bylaws). The Master Deed defined both the unit elements and the common elements comprising a condominium building. The Master Deed also specified the responsibility for and method of addressing casualty losses to the property.

Specifically, Section 11.02 of the Master Deed provided that if any building, improvement, or common element or part thereof was damaged by casualty, the repair, restoration, or disposition of insurance proceeds must be done in accordance with its terms. Section 11.05 stated that if damage was only to those parts of the unit for which the responsibility for repair was that of the unit owner, then the net insurance proceeds would be paid to the unit owner. Section 11.04 specified that if insurance proceeds derived from property loss exceeded $25,000, the Board of Trustees (Board) of the Association shall enter into a contract with a licensed contractor for the repair or rebuilding of all the damaged portions of the affected property in accordance with all applicable

4

building codes. Subsection (C) of Section 11.04 further provided that the Board shall employ a qualified party to supervise the repair work to ensure that such work was properly performed in accordance with plans and specifications.

On October 11, 2020, plaintiff filed a complaint against the Association alleging that on January 11, 2020, her unit had been "flooded with water from the above unit." In the complaint, plaintiff claimed that her primary insurance was the Association and because it was "refusing to give [her] the money to fix [her] condo" and she had "exhaust[ed] . . . [her] temporary living expenses" from her own insurance policy with Allstate Insurance Company (Allstate), she was "forced to move back" into her "uninhabitable" unit, which "[did not] have a shower, kitchen, [or] ceiling."

The complaint further alleged that plaintiff and her family had "suffered emotional and physical distress" from being displaced from the unit "for [nine] months during a global pandemic." In addition, plaintiff asserted that her "human rights ha[d] been violated" because the Association had enabled two "white male" tenants who were "involved in the incident . . . to fix their condos without any issues" but had "discriminat[ed]" against her as "a single woman of color." In the complaint, plaintiff requested relief in the form of damages, attorneys' fees, and "any other relief" the court deemed proper.

A-3008-23

The Association filed a contesting answer, asserting nine affirmative defenses and a counterclaim. The counterclaim alleged that the January 11, 2020 flood had damaged "the interior of plaintiff's unit" and "[t]he two units located directly above plaintiff's unit," as well as "common elements of the building." As a result, "[p]laintiff submitted a claim to the Association for insurance proceeds" to repair her unit and the common elements "that were covered by the Association's casualty insurance policy" with Philadelphia Indemnity Insurance Company (PIIC).

According to the counterclaim, "Decker Associates adjusted plaintiff's claim on behalf of . . . [PIIC] and produced a list of items for repair and replacement in and adjacent to plaintiff's unit," including "removal of the unit's sheetrock to inspect the walls for potential mold and other underlying damage." Thereafter, "[PIIC] paid the Association the net sum of $36,147.71," after withholding the policy's deductible and an amount for depreciation. The counterclaim further alleged that plaintiff received insurance proceeds in the amount of $23,521.21 from Allstate "to be used for repairs of her unit, plus $3,333.33 representing Allstate's estimate of her share of the Association's policy deductible."

A-3008-23

The counterclaim asserted that despite the requirement in Section 11.04 of the Master Deed that the Association should contract directly with a licensed contractor for the repairs, the Association acquiesced to plaintiff's demand "to retain her own contractor," conditioned upon the contractor "provid[ing] the Association with approved plans, appropriate construction permits[,] and a proper certificate of insurance." However, "little work ha[d] been done in accordance with the scope of work that was presented by plaintiff's contractor" and plaintiff had refused to permit the Association "to conduct a complete inspection of the walls" or "make the necessary repairs." Plaintiff's unit thus "remain[ed] in an unsafe and dangerous condition" and "create[d] a risk of further damage to common elements, the unit itself[,] and other units." The counterclaim sought damages and injunctive relief "compelling plaintiff to grant the Association immediate access to her unit to fully inspect the unit and to complete all remaining repairs to the common elements and the unit" and to pay the Association the Allstate insurance proceeds "to complete the repairs."

In response, plaintiff filed a document objecting to the Association's affirmative defenses and counterclaim.[2] In it, plaintiff asserted that any delay in completing the repairs was due to the Association's piecemeal requests of

_____

[2] Page three of the document is missing from the record.

plaintiff and her contractor as well as the Association's directive in April 2020 to "stop doing any work." Plaintiff claimed that she had allowed the Association's inspectors into her unit "many times to assess the damages," that she had already used the Allstate insurance proceeds to replace her tangible personal property, and that two additional floods had occurred since the January 11, 2020 flood, causing further damage to her unit. According to plaintiff, a second flood occurred on May 1, 2020, and a third flood occurred on December 2, 2020. Although the Association had sent representatives to assess the additional damage, plaintiff said she had not received any estimates for the new damage.

Thereafter, plaintiff filed a first amended complaint (FAC) dated December 30, 2021, naming the Association, Allstate, Jacobson Goldfarb Scott Insurance (JGS), and NJM Insurance Group as defendants. She sought the same relief but added claims for breach of contract and breach of fiduciary duty and included damages for destruction of personal property and health issues due to "mold," "dust," "lack of nutrition," and "lack of necessary daily hyg[i]ene." Plaintiff filed a second amended complaint (SAC) dated February 23, 2022, naming the same parties and requesting the same relief. In the SAC, plaintiff asserted that her unit suffered water damage three times after the initial flood—

May 1, 2020, December 2, 2020, and September 1, 2021—resulting in further damage. The Association filed a contesting answer to the SAC, asserting twenty-four affirmative defenses and cross-claims for breach of contract, contribution, and indemnification against the co-defendants.

Plaintiff then filed a third amended complaint (TAC) dated May 19, 2022. In the TAC, plaintiff added the individual defendants, identifying them as "the owners of the units that flooded [her] unit."[3] The complaint alleged plaintiff's "entire condo and personal belongings were damaged and made unliv[able]" by the four flooding incidents and that the individual defendants and "their respective insurance companies ha[d] not paid . . . plaintiff any compensation to repair her condo." Plaintiff again alleged physical and emotional distress, and sought damages, attorneys' fees, costs of suit, and "other relief." The Association filed an answer to the TAC, asserting the same twenty-four affirmative defenses and cross-claims.

On January 6, 2023, the Association moved for partial summary judgment on its counterclaim, seeking to compel plaintiff "to permit the Association to make repairs to the common elements in and around [p]laintiff's unit and to

_____

[3] Plaintiff titled the document "Fourth Amended Complaint" and did not include NJM Insurance Group as a defendant.

restore the [u]nit to its pre-loss structural condition." In support, the Association submitted the January 4, 2023 certification of Kathleen Fazzaro, the property manager for Crosspointe Condominium, who confirmed the accuracy of several motion exhibits, including pertinent portions of the Master Deed and Bylaws; an April 8, 2020 email exchange between the Association's attorney and plaintiff; and a report by Accurate Reconstruction, a contractor retained by the Association, estimating the cost to repair the unit and common elements at approximately $33,954.73. In the April 8, 2020 email exchange, plaintiff wrote that "no one [was] allowed [to] touch" her unit because the Association had a "long history of discriminating" against her and "trying to kill [her]."

The Association filed two additional motions for summary judgment, one to dismiss plaintiff's claims for emotional and physical damages, and one to dismiss the complaint for failure to prove causation. In support, the Association submitted excerpts from plaintiff's October 4, 2022 deposition, in which she denied seeking treatment from any mental health professional and claimed that the flooding incidents, for which she allegedly sustained significant damage to her personal possessions and fixtures, were caused by "broken pipes" in adjoining units. The Association also submitted a supporting certification by its counsel, in which counsel averred that "[p]laintiff ha[d] not served an expert

report to substantiate a compensable claim for emotional damages and physical injuries, and her time to serve [such] a report ha[d] expired." Counsel further certified that "[p]laintiff ha[d] not served an expert report as to causation for any of the four water intrusions or to substantiate her claim for damages, and her time to serve [such] a report ha[d] expired."

The individual defendants also filed motions for summary judgment. Although plaintiff did not oppose any of the summary judgment motions, she moved for summary judgment of her own, seeking damages in the amount of $2.1 million, constituting $100,000 for "the present[-]day inflated estimate amount to fix her condo," and $2 million "for forcing [her] to live in . . . uninhabitable, inhumane living conditions."

In three separate orders entered on February 3, 2023, the judge granted the Association's unopposed motions pursuant to Rule 1:6-2, "substantially for the reasons set forth in the moving papers." The order addressing the counterclaim required plaintiff to "permit the Association access to her [u]nit to: (a) make the necessary repairs to the [c]ommon [e]lements in and around [her unit]; and (b) restore the [u]nit to its pre-loss condition." The remaining orders dismissed plaintiff's complaint and all cross-claims as to the Association

with prejudice. The same day, the judge also issued orders granting the individual defendants' unopposed motions for summary judgment.

Subsequently, on February 21, 2023, plaintiff filed a motion "to redact the partial summary [judgment] that was granted on February 3, 2023 because . . . [the Association] has yet to show documented proof that the common elements . . . were damaged." In support of her motion, plaintiff provided a certification responding to the statement of material facts submitted with the Association's motion for summary judgment on its counterclaim. In the certification, plaintiff asserted that based on the estimate of the Association's Insurance Adjuster, David Shupe of Decker Associates, as well as her contractor's report, "no common elements" sustained water damage. Plaintiff also included Shupe's estimate; her contractor's proposal; an unsigned construction permit dated June 4, 2020; and communications between plaintiff, her contractor, the Association, its lawyer, and Decker Associates.

The Association opposed plaintiff's motion, supporting its opposition with certifications from counsel and a counterstatement of material facts, including Sections 3.01 and 3.02 of the Master Deed which described the boundaries of and the items included in each unit. In the counterstatement of material facts, the Association asserted:

Stated simply, [plaintiff's] unit only includes the face (gy[]psum board) of the sheet rock only, not the entire sheet rock. The balance of the sheet rock, which [plaintiff] acknowledges was damaged in this matter is common area as are the firestops associated with same. Typical sheet rock consists of three parts: two paperboards that sandwich gypsum, a powdery white or gray material. Face; interior; Face. [Plaintiff's] unit includes only the paper faceboard adjacent to the interior of the unit. The gy[]psum and the backside of the paperboard are not part of her unit, but are common elements as are the life safety firestops that are part of installation of the sheetrock.

Although plaintiff's motion only addressed the Association's counterclaim, the judge treated it as one for reconsideration of all orders issued on February 3, 2023, and heard oral argument on June 2, 2023. Following oral argument, the judge summarily denied reconsideration of the orders granting summary judgment to the individual defendants and denied reconsideration on the Association's counterclaim. The judge credited the Association's argument that plaintiff had "not demonstrated any . . . basis for reconsideration" and issued an order on June 13, 2023, memorializing that decision. The June 13, 2023 order allowed the Association to enter plaintiff's unit "without notice" to inspect it and restore common elements, and to do what was "reasonably necessary to access the [u]nit for such purpose, including changing the lock."

13

As to the other two February 3, 2023 orders dismissing plaintiff's complaint against the Association, the judge granted reconsideration. However, after further motion practice, the judge ultimately granted the Association summary judgment and dismissed plaintiff's complaint in its entirety in an order entered October 6, 2023. Just prior to the entry of the October 6, 2023 order, the Association filed a motion "for an [o]rder permitting the Association to complete construction of plaintiff's unit without [her] input," noting in counsel's supporting certification that plaintiff "never responded" to the Association's letters sent in accordance with the judge's June 13, 2023 order and had "expressed on numerous occasions . . . that she intend[ed] to rip out any finishes made by the Association." Plaintiff opposed the motion.

In a May 14, 2024 order,[4] the judge granted the Association's motion, stating:

> Although plaintiff filed opposition, her papers are [non-]responsive and mainly re-hash arguments that she previously made throughout the pendency of this matter which have been rejected by this court. Also, the court notes that plaintiff includes certain bizarre and irrational fears in her papers; to wit, she is concerned that the . . . Association will poison her with "killing chemicals" and that the . . . Association will install

---

[4] The judge issued nine additional orders on May 14, 2024, adjudicating a litany of motions filed by plaintiff, all of which the judge denied as frivolous, unfounded, or repetitious.

hidden cameras and spy on her . . . . The reason that the court granted the Association the authority to complete repairs in . . . [p]laintiff's apartment regardless of her cooperation is due to potential public health issues which could endanger . . . [p]laintiff's neighbors who reside in attached units. This was a water damage/potential mold case.

Plaintiff subsequently filed an amended notice of appeal identifying the February 3, 2023, June 2, 2023, and May 14, 2024 orders as the subjects of her appeal.[5] As previously stated, only consideration of the February 3, 2023 order pertaining to the Association's counterclaim was properly preserved for appeal and we deem all other issues abandoned, including challenging the denial of reconsideration of the February 3, 2023 order. See Telebright Corp., 424 N.J. Super. at 393.

## II.

We review a trial court's summary judgment ruling "de novo under the same standard as the trial court." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016). That standard is well-settled.

[I]f the evidence of record—the pleadings, depositions, answers to interrogatories, and affidavits—"together with all legitimate inferences therefrom favoring the

---

[5] Plaintiff also identified an October 13, 2023 order in the amended notice of appeal. However, no such order exists.

A-3008-23

non-moving party, would require submission of the issue to the trier of fact," then the trial court must deny the motion. R. 4:46-2(c); see Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). On the other hand, when no genuine issue of material fact is at issue and the moving party is entitled to a judgment as a matter of law, summary judgment must be granted. R. 4:46-2(c); see Brill, 142 N.J. at 540.

[Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 366 (2016) (citation reformatted).]

Whether a genuine issue of material fact exists depends on "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill, 142 N.J. at 523. However, "Rule 4:46-2(c)'s 'genuine issue [of] material fact' standard mandates that the opposing party do more than 'point[] to any fact in dispute' in order to defeat summary judgment." Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016) (alterations in original) (quoting Brill, 142 N.J. at 529).

Where there is no material fact in dispute, we "must then 'decide whether the trial court correctly interpreted the law.'" DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007),

16

overruled on other grounds by Wilson ex rel. Manzano v. City of New Jersey, 209 N.J. 558 (2012)). "We review issues of law de novo and accord no deference to the trial judge's [legal] conclusions . . . ." MTK Food Servs., Inc. v. Sirius Am. Ins. Co., 455 N.J. Super. 307, 312 (App. Div. 2018).

Plaintiff essentially argues the judge erred in granting the Association summary judgment on its counterclaim because no common elements were damaged by the flooding and she was thus entitled to the insurance proceeds from PIIC to repair her unit. In support, she asserts that no "common elements" as defined by the Master Deed and Bylaws were "stated on any estimates . . . [as] damaged by the flood(s)." Therefore, she contends that the Association did not have the right to repair her unit and had a "fiduciary duty to give the [PIIC] insurance proceeds to [her]."

"The physical extent of [a unit] depends upon what has been included in the common elements." Siller v. Hartz Mountain Assocs., 93 N.J. 370, 382 (1983). Whether an item is a common element "may be ascertained by examination of the statutory definition and the master deed." Ibid. N.J.S.A. 46:8B-3(d) defines "common elements" for condominiums in New Jersey. That definition includes:

> as to any improvement, the foundations, structural and bearing parts, supports, main walls, roofs, basements,

halls, corridors, lobbies, . . . and other means of access, <u>excluding any specifically reserved or limited to a particular unit or group of units</u>;

. . . all other elements of any improvement necessary or convenient to the existence, management, operation, maintenance and safety of the condominium property or normally in common use; and

. . . such other elements and facilities as are designated in the master deed as common elements.

[<u>Ibid.</u> (emphasis added).]

"[A]s a general matter the thrust of [N.J.S.A. 46:8B–3(d)] is to define common elements in general as those elements existing or intended for common use." <u>Belmont Condo. Ass'n, Inc. v. Geibel</u>, 432 N.J. Super. 52, 85 (App. Div. 2013) (quoting <u>Soc'y Hill Condo. Ass'n, Inc. v. Soc'y Hill Assocs.</u>, 347 N.J. Super. 163, 170 (App. Div. 2002)). We previously summarized the distinction between a common element and a unit as follows:

One easy way to visualize a condominium unit is as a cube of air, the tangible boundaries of which are usually the finished side of the interior sheetrock, ceilings[,] and floors. While many condominiums vary this definition slightly (driven, in part, by allocating maintenance responsibilities), the condominium unit is generally seen by owners as the "inside" of their structure while the shell and "outside" of the building is a common element.

[<u>Ibid.</u> (quoting <u>Soc'y Hill</u>, 347 N.J. Super. at 172).]

18

Our citation to the 1994 Uniform Common Interest Ownership Act's definition of unit boundaries in Society Hill is also instructive:

> Except as provided by the declaration:
>
> (1) If walls, floors, or ceilings are designated as boundaries of a unit, all lath, furring, wallboard, plasterboard, plaster, paneling, tiles, wallpaper, paint, finished flooring, and any other materials constituting any part of the finished surfaces thereof are a part of the unit, and all other portions of the walls, floors, or ceilings are a part of the common elements.
>
> [Soc'y Hill, 347 N.J. Super. at 172 n.1 (quoting Unif. Common Int. Ownership Act § 2–102, 7 U.L.A. 65 (1994)).]

Section 3.01 of Article III of the Master Deed describes the boundaries of each Crosspointe Condominium unit as follows:

> Each [u]nit is intended to contain all space within the area bounded by the interior surface of the perimeter walls of each [u]nit and the lowermost floor and the uppermost ceiling of each [u]nit as follows:
>
> BOTTOM: The bottom is an imaginary horizontal plane through the lowest point of the interior surface of each portion of subfloor, if any, within the [u]nit, and extending in every direction to the point where it closes with a side of such [u]nit.
>
> TOP: The top is an imaginary horizontal plane along and coincident with the unfinished and unexposed upper surface of the gypsum board or other material which forms the uppermost ceiling of the [u]nit,

19

A-3008-23

extending in every direction to the point where it closes with every side of such [u]nit.

SIDES: The sides of each [u]nit are imaginary vertical planes along and coincident with the innermost surface of the studding of the perimeter walls. . . . The sides of each such [u]nit are bounded by the bottom and top of the [u]nit.

Section 4.01 defines the common elements as "[a]ll appurtenances and facilities and other items which are not part of the [u]nits described in Article III," including "exterior or interior bearing or main walls and floors between [u]nits."[6]

Section 7.01, which sets forth each unit owner's responsibilities, reads:

Each [u]nit [o]wner is responsible to perform all of the maintenance, repairs[,] and replacements that may be required within the boundaries of his own [u]nit, at his own expense, and in accordance with the requirements of this Master Deed and the [Bylaws] . . . .

In addition, each [u]nit [o]wner shall be responsible to perform all of the maintenance, repairs[,] and replacements that may be required for parts of his [u]nit which are not located within the boundaries of his [u]nit as set forth in Section 3.01 when the following conditions are met:

---

[6] Section 1.14 provides that "'[g]eneral [c]ommon [e]lements' shall have the same meaning as '[c]ommon [e]lements' pursuant to N.J.S.A. 46:8B-3(d), except as same may be modified by the provisions of Article IV of th[e] Master Deed."

(i) the part of the [u]nit is accessible without a breaking or intrusion into the [c]ommon [e]lements or any other [u]nit; and

(ii) the part of the [u]nit is not functionally connected with a [c]ommon [e]lement or a component of an integrated system which services more than one [u]nit.

In turn, Sections 7.02 and 7.03 describe the Association's responsibilities and rights. Section 7.02 provides that "[t]he Association shall . . . furnish the maintenance, repairs[,] and replacements that are required for any part of a [u]nit not located within the boundaries of the [u]nit as set forth in Section 3.01 herein (except as otherwise provided in Section 7.01 herein) . . . ." Section 7.03 provides:

The Association may effect emergency repairs to any [u]nit which the [o]wner of that [u]nit has failed to perform . . . . The Association may also effect non-emergency repairs within the boundaries of a [u]nit which the [u]nit [o]wner has failed to perform . . . if (i) any such failure to maintain by the [u]nit [o]wner will have a material and adverse impact upon any other portion of the [c]ondominium and (ii) the [u]nit [o]wner(s) responsible for such . . . repair . . . have failed to remedy the situation within sixty . . . days after written notice is given by the Association to do so.

Relatedly, Section 8.03 reserves both a "perpetual exclusive easement" for the Association to maintain "any [c]ommon [e]lements, including those which presently or may hereafter encroach upon a [u]nit," and a "perpetual and non-

21

exclusive right of access to each [u]nit (i) to inspect same, (ii) to remedy any violations of the provisions of th[e] Master Deed[ or Bylaws] . . . , and (iii) to perform any operations required in connection with the maintenance, repairs or replacements of or to the [c]ommon [e]lements . . . ." See Restatement (First) of Prop. § 493 cmt. c (A.L.I. 1944) ("An exclusive easement in gross is one which gives the owner the sole privilege of making the uses authorized by it.").

Taken together, these provisions of the Master Deed establish that some parts of each unit's perimeter walls lie outside the unit's boundaries, making it solely the Association's responsibility to repair those portions. Only the interior-facing surface of the sheetrock belongs to the unit itself; the remainder of the sheetrock, including the material covering the outermost portions of the wall, is considered a common element. It is also the Association's duty to make "non-emergency repairs within the boundaries of a [u]nit," which the unit owner has failed to perform after written notice, if the failure to repair will adversely impact any other portion of the Condominium. This conclusion is dictated by the Master Deed and accords with precedent addressing the topic. See Soc'y Hill, 347 N.J. Super. at 172.

The Association submitted competent evidence to support its summary judgment motion. In addition to relevant provisions of the Master Deed and

22

Bylaws, Fazzaro certified that the January 11, 2020 flood caused "substantial" damage "to the interior of plaintiff's unit" as well as "common elements of the building" adjacent to plaintiff's unit. According to Fazzaro, after plaintiff's contractor submitted a proposal that "did not include any of the work set forth in the adjuster's estimate" and "failed to obtain the necessary permits from the township," the Association was "prepared to implement the necessary repairs." However, plaintiff "refused to allow the Association to make the required repairs to the common elements, while her unit remain[ed] in an unsafe and dangerous condition and create[d] a risk of further damage to common elements, the unit itself and other units." The Association also submitted its contractor's estimate showing that batt insulation and drywall needed to be replaced. These submissions, which were unopposed by plaintiff, sufficed to establish that common elements were damaged by the flood. We are also convinced that the Association was entitled to make the necessary repairs in light of plaintiff's recalcitrance and the risks posed by the unabated flood damage. See Claypotch v. Heller, Inc., 360 N.J. Super. 472, 488-89 (App. Div. 2003) (noting that unopposed statements of material fact are "deemed admitted" when "sufficiently supported" by affidavits "made on personal knowledge" (first quoting R. 4:46-2(b); and then quoting R. 1:6-6)).

A-3008-23

We also reject plaintiff's contention that the Association was obligated to turn over the PIIC insurance proceeds to her rather than use it to perform the repairs. Under Section 11.04 of the Master Deed, the Association was authorized to utilize insurance proceeds from property loss that exceeded $25,000 to repair damage to the common elements. Under Section 11.05, insurance proceeds are only "made available" to unit owners when "damage is only to those parts of a [u]nit for which the responsibility for maintenance and repair is that of the [o]wner." As maintenance of common elements is not a unit owner's responsibility under Section 7.02 and the insurance payment exceeded $25,000, plaintiff had no right to the PIIC insurance proceeds. See Belmont Condo. Ass'n, 432 N.J. Super. at 85. We therefore conclude that the judge correctly granted partial summary judgment to the Association on its counterclaim.[7]

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division

---

[7] The judge found the summary judgment motion "meritorious on its face" and granted it "for the reasons set forth in the moving papers." Although "both Rule 1:7-4 and Rule 2:5-1(b) specifically state that the court 'shall' set forth the facts and make conclusions of law to support the order or judgment," we have held that "[t]he trial judge may satisfy the court rules by relying on the facts or reasons advanced by a party; however, the court is obligated to make the fact of such reliance 'explicit.'" Allstate Ins. Co. v. Fisher, 408 N.J. Super. 289, 301 (App. Div. 2009) (citing Pressler, Current N.J. Court Rules, cmt. 1 on R. 1:7–4 (2009)). Here, we are satisfied the judge complied with the court rules.

A-3008-23